**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSE MURGUIA, for himself and for the Estates of Mason and Maddox Murguia,

*Plaintiff-Appellant*,

v.

HEATHER LANGDON; COUNTY OF TULARE; LEWIS, Deputy at Tulare County Sheriff Department; ROXANNA TORRES, Social Worker at the Child Welfare Service; CITY OF TULARE; GARCIA, Sergeant at Tulare Police Department; FIRST ASSEMBLY OF GOD OF VISALIA; CERDA,

*Defendants-Appellees*.

No. 21-16709

D.C. No.
1:19-cv-00942-
DAD-BAM

ORDER

Filed July 18, 2023

Before:  Carlos T. Bea, Sandra S. Ikuta, and Morgan Christen, Circuit Judges.

Order;
Dissent by Judge Bumatay

# SUMMARY[*]

## Civil Rights/State-Created Danger Doctrine

The panel denied a petition for panel rehearing, and denied a petition for rehearing en banc after a request for a vote on whether to rehear the matter en banc failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration, in an action brought pursuant to 42 U.S.C. § 1983 involving the application of the "state-created danger" doctrine in the context of a welfare check.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, and R. Nelson, stated that the court should have seized this opportunity to correct its longstanding errors in applying the state-created danger doctrine and place itself back on track with Supreme Court precedent and the Constitution's text. Judge Bumatay wrote that only affirmative acts that cause the deprivation of liberty may suffice for a state-created danger claim.

# ORDER

Judges Bea and Christen voted to deny the petition for panel rehearing. Judge Ikuta voted to grant the petition for panel rehearing. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a majority of the votes of the nonrecused active judges in favor of en banc consideration. *See* Fed. R. App. P. 35(a).

The petition for panel rehearing and rehearing en banc is **DENIED.** A dissent from the denial of rehearing en banc, prepared by Judge Bumatay, is filed concurrently with this order.

---

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA and R. NELSON, Circuit Judges, dissenting from the denial of rehearing en banc:

As a general matter, the Constitution constrains the actions of only government actors. It ordinarily provides no relief to those injured by private parties. Faced with tragic facts, however, we may be tempted to expand the scope of constitutional rights to grant relief to injured parties in federal court. But our job is to look to the text and history of the Constitution for the scope of constitutional remedies—not simply to "make good the wrong done." *Boule v. Egbert*, 998 F.3d 370, 374 (9th Cir. 2021) (Bumatay, J., dissenting) (quoting *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971)), *rev'd*, 142 S. Ct. 1793 (2022).

Ignoring this principle, most circuit courts, including ours, have recognized the "state-created danger" doctrine as a substantive component of the Fourteenth Amendment's Due Process Clause. Extrapolating from just two sentences in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), federal courts have carved out an exception to the rule that the Due Process Clause does not obligate the State to protect its citizens from harm caused

by private actors. Our court allows plaintiffs to seek damages against State actors who, by their "affirmative acts," place plaintiffs in danger of injury from others. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018).

But the state-created danger exception finds no support in the text of the Constitution, the historical understanding of the "due process of law," or even Supreme Court precedent. And as the Court recently emphasized, we should be reluctant to recognize rights not mentioned in the Constitution to "guard against the natural human tendency to confuse what [the Fourteenth] Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247 (2022). As such, at least one circuit has questioned the legitimacy of this recent-vintage right. *See Fisher v. Moore*, 62 F.4th 912, 913 (5th Cir. 2023) (declining to adopt state-created danger doctrine because of the Supreme Court's "forceful pronouncements signaling unease with implied rights not deeply rooted in our Nation's history and tradition"). And given its opaque origins, the doctrine has also caused a split among the other circuits about how to apply it.

Even if the state-created danger doctrine is properly considered a substantive due process right (which may be doubtful), we should reject its undue expansion and align it with the text of the Due Process Clause and Supreme Court precedent to the extent possible. But since the inception of the doctrine, courts have increasingly broadened its reach. *See* Matthew Pritchard, *Reviving* DeShaney: *State-Created Dangers and Due Process First Principles*, 74 Rutgers U. L. Rev. 161, 175 (2021). Now, almost any conceivable action by a State actor can lead to a constitutional violation. And

every expansion of the right moves the doctrine farther away from the Constitution and the Court's precedent.

*Murguia v. Langdon*, 61 F.4th 1096 (9th Cir. 2023), continues this trajectory. In this case, our court once again aggrandizes the "state-created danger" doctrine and expands its scope. Now, commonplace actions—like providing a ride, booking a motel room, or telling a lie—when done by a State actor, could become due process violations if the actions eventually lead to injuries caused by third parties. While Jose Murguia has suffered profound tragedy and deserves redress, the Constitution doesn't provide the remedy.

Instead, we should have recognized that the Due Process Clause requires a "deprivation of liberty" because it was intended to prevent abuses of coercive state authority—not torts that happen to be committed by State actors. *DeShaney*, 489 U.S. at 200. So we should have confined the "state-created danger" doctrine to only encompass affirmative acts by a State actor that constitute the use of the government's coercive power to restrain the liberty of another. If those acts place a plaintiff in harm's way, then we may rightfully have a constitutional violation. But without a restraint of liberty, we remain in the realm of ordinary torts. And here, we let due process claims continue against several State actors without any allegation that they exercised the coercive power of the State. We should have affirmed the dismissal of Murguia's due process claims.

It's long past due that we revisit the state-created danger doctrine. This case presented us with a prime opportunity to reconcile our state-created danger jurisprudence with Supreme Court precedent and our Constitution. Regrettably, our court has passed it up.

I respectfully dissent from the denial of rehearing en banc.

## I.

The facts here, as in many state-created danger cases, are deeply troubling.

## A.

### Factual Background

Jose Murguia and Heather Langdon had a turbulent relationship. They met in 2004, got married, divorced in 2015, and were living together again in 2018. They had five children together, including twin boys, Mason and Maddox, born in early 2018. Langdon suffered from severe mental illness and, over the years, had been accused of abusing Murguia and their children. Because of her mental illness, she was arrested several times and lost custody of her children at various points.

Leading up to December 2018, Langdon's mental health began to deteriorate. In late November 2018, for example, Langdon told her oldest son that it was the end of times because "a fire had destroyed the town of Paradise, and that she was thinking at a higher power." In early December, she also falsely told others that her oldest son threatened to shoot up an elementary school. Langdon's mental illness became so severe that, on December 4, Murguia called the police for help with Langdon's erratic behavior. Deputies from the Tulare County Sheriff's Department arrived, but they told Murguia to call back if Langdon threatened herself or others.

## i.

## Deputy Lewis and Sergeant Cerda's Actions

The next day, December 5, Langdon told Murguia that she drank "bleach and vinegar to cleanse the demons in her soul." Murguia then called 911. Tulare County Sheriff's Department officials, including Deputy Lewis and Sergeant Cerda, responded. When Deputy Lewis arrived, he ordered Murguia to step outside, away from the twins and Langdon. Langdon told Deputy Lewis and Sergeant Cerda that she could see dead people and that Murguia was a devil worshiper. After being ordered outside, Murguia went to the house of their neighbor and friend, Rosa. Rosa accompanied Murguia back to his house, and a deputy allowed Rosa to go inside to see Langdon. A deputy told Rosa that she should take Langdon to the hospital.

Rosa tried convincing Langdon to go to the hospital, but Langdon refused and insisted that they take the twin babies to church because Murguia's "house was hexed." Rosa agreed to bring Langdon and the twins to Langdon's church. Murguia begged Deputy Lewis and Sergeant Cerda not to let Langdon leave with the twins because they were not safe with her. But they allowed the twins to remain with Langdon and Rosa. Deputy Lewis and Sergeant Cerda then stayed outside Murguia's home for 30 minutes to make sure he didn't follow Langdon and the twins. Murguia feared that Deputy Lewis and Sergeant Cerda would arrest him if he tried.

## ii.

## Sergeant Garcia's and Social Worker Torres's Actions

When Rosa, Langdon, and the twins arrived at the church, Rosa warned church receptionists that the twins

were in danger and needed to be taken away from Langdon. One receptionist responded that the twins would be in good hands with the pastor. Langdon told the pastor that she was homeless, needed shelter, and wanted mental health help. The pastor asked Langdon if she would go to a mental health center for an evaluation and she said yes. The pastor called 911. Instead of a hospital, however, police officers brought Langdon and the twins to the Lighthouse Shelter, a women's shelter in Tulare, California. At Lighthouse, the staff observed Langdon continuing to act erratically, and they eventually called the police.

Officers from the Tulare Police Department arrived at Lighthouse and witnessed Langdon yelling and acting belligerent. Officers offered to take her to the hospital, but Langdon refused, and they left her and the twins at Lighthouse. Based on Langdon's continued belligerent behavior, Tulare Police officers were called back to Lighthouse 40 minutes later. This time, an officer brought in Sergeant Garcia, a Tulare Police Crisis Intervention Technician Officer, for assistance.

To learn more about Langdon, Sergeant Garcia called Roxanne Torres, an emergency response social worker with the County of Tulare Child Welfare Services. Torres falsely told Sergeant Garcia that Langdon did not have a history of child abuse. In fact, Child Welfare Services knew that Langdon had three criminal convictions for child cruelty and prior child welfare investigations, including an active case against Langdon. Torres also failed to inform Sergeant Garcia that Murguia was available to take custody of the twins.

For his part, Sergeant Garcia told Torres that he did not want to separate the twins from Langdon and falsely

reported that Langdon had been evaluated at a hospital and did not meet the criteria for involuntary commitment. Based on her call with Sergeant Garcia, Torres concluded Langdon was not an imminent threat to the children and decided not to initiate an immediate, in-person investigation of Langdon. After the call with Torres, Sergeant Garcia and two other police officers arranged for a motel to provide Langdon with free lodging and drove her and the twins to the motel.

The following morning, tragedy struck. At the motel, Langdon was observed screaming for help. A bystander called the police. When paramedics arrived, they found the twins had been drowned and were lying dead on the motel bed. Langdon was later prosecuted for murder but found not guilty by reason of insanity.

## B.

## Procedural History

Murguia brought suit under 42 U.S.C. § 1983 against Deputy Lewis, Sergeant Cerda, Sergeant Garcia, Torres, and others, for violating his constitutional rights under the state-created danger doctrine. The district court dismissed, and Murguia appealed.

A split panel of this court reversed in part. The panel majority affirmed the dismissal of Deputy Lewis and Sergeant Cerda from the suit. Because they "merely replaced one competent adult—[Murguia]—with another competent adult—Rosa," the panel majority held that the deputies did not leave the twins "in a situation that was more dangerous than the one in which they found them." *Murguia*, 61 F.4th at 1113 (simplified). The panel majority allowed the claim against Sergeant Garcia to proceed because "[w]hen Garcia left Langdon and the twins at the

motel, he removed them from the supervision of the Lighthouse staff and rendered the twins more vulnerable to physical injury by Langdon as a result of their isolation with her." *Id*. Finally, the majority concluded that the claim against Torres should continue because she provided Sergeant Garcia with false information, thus "render[ing] the twins more vulnerable to physical injury by Langdon by eliminating the most obvious solution to ensuring the twins' safety: returning them to [Murguia's] custody." *Id*. at 1115.

Judge Ikuta dissented, pointing out that our court has expanded the state-created danger doctrine to "a significant degree" and that the panel majority's decision takes our court far afield of Supreme Court precedent. *Id.* at 1122 (Ikuta, J., dissenting). Judge Ikuta explained that "the state-created danger doctrine applies only when an injury is caused by a state's abuse of its executive power undertaken with the intent to injure someone in a way unjustifiable by any government interest, not when the injury is the result of mere negligence." *Id.* (simplified). Under this framework, Judge Ikuta would have dismissed the remaining claims on appeal. *Id.* at 1124–26.

Judge Ikuta's concerns are well justified, and we should have corrected the panel majority's error on en banc review.

## II.

### A.

### The Original Understanding of the Due Process Clause

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As a textual matter, "nothing in the language of the Due Process Clause . . . requires the State to

protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. at 195. And as a historical matter, the Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Hurtado v. California*, 110 U.S. 516, 527 (1884) (quoting *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819)); *see also* Edward S. Corwin, *The Doctrine of Due Process of Law Before the Civil War*, 24 Harv. L. Rev. 366, 368 (1911).

Thus, as a matter of text and history, the focus of the Due Process Clause was a protection against the arbitrary use of the "exclusive sovereign prerogative to coerce or restrain action." Pritchard, 74 Rutgers U. L. Rev. at 192. The Clause served "as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. The due process right then "cannot fairly be extended to impose an affirmative obligation on the State to ensure" that life, liberty, and property "do not come to harm through" private action. *Id*. In other words, the Clause was meant "to protect the people from the State, not to ensure that the State protected them from each other." *Id*. at 196. Ordinarily "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id*. at 197.

To be sure, as the Court has recognized, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Under the so-called "special relationship" doctrine, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety or general well-

being." *Id.* at 199–200 (citing *Estelle v. Gamble*, 429 U.S. 97 (1976), and *Youngberg v. Romero*, 457 U.S. 307 (1982)). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200.

So for over a century after the ratification of the Fourteenth Amendment, no court had recognized a substantive due process right against injury from private actors under a "state-created danger" exception. Instead, courts placed strict limits on substantive due process to reflect the well-established principle that the Constitution is not "a font of tort law." *Paul v. Davis*, 424 U.S. 693, 701 (1976). This is "because [the Fourteenth] Amendment did not alter the basic relations between the States and the national government." *Id.* at 700 (quoting *Screws v. United States*, 325 U.S. 91, 109 (1945)). In accord with this understanding of federalism, the Supreme Court has stressed that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202; *see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("Our Constitution . . . does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."). Rather, the Constitution generally leaves the regulation of

torts committed by public officials to the States. Indeed, many States—including the one in this case—provide relief to plaintiffs for injuries caused by State officials' tortious conduct. *See, e.g.*, Cal. Gov't Code § 820.

## B.

### The Creation of the State-Created Danger Doctrine

Given this background, an obvious question arises: where did the state-created danger doctrine come from? It's not from the text of the Due Process Clause. Nor did it originate from a historical understanding of the "due process of law." It didn't even come from a Supreme Court pronouncement of the right. The simple answer—the right was plucked from just two sentences in *DeShaney*. Like Athena from Zeus's forehead, from two lines in the U.S. Reports sprung an atextual and ahistorical expansion of substantive due process rights. But unlike with Athena, the doctrine's wisdom is not apparent.

Recall the facts of *DeShaney*: Joshua DeShaney was a young boy whose father inflicted horrible abuse on him. 489 U.S. at 191. After multiple visits to Joshua's home, county caseworkers observed signs of abuse and temporarily removed him from his father's custody. *Id*. at 192. But Joshua was returned home a short while later. *Id*. After his return, his father beat him so badly that he fell into a coma and suffered severe brain damage. *Id*. at 193. Joshua blamed his county's social services department for failing to prevent the violence. *Id*. at 193. Joshua and his mother filed a § 1983 action, alleging that the State violated his substantive due process rights by failing to protect him from his father's abuse. *Id*. at 193, 195.

Based on its text and history, the Court rejected Joshua's argument that the Due Process Clause created an "affirmative obligation on the State to provide the general public with adequate protective services." *Id*. at 197. But the Court also looked at whether the "special relationship" exception fit the situation and concluded it "ha[d] no applicability" to Joshua's circumstances. *Id.* at 201. There, the Court explained:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.*

From these two lines explaining why the "special relationship" exception could not save Joshua's constitutional claim, circuit courts throughout the country have fashioned a brand new substantive due process right— the so-called "state-created danger" exception.

Take our circuit: from *DeShaney*'s language that the State "played no part in [the dangers'] creation, nor did it do anything to render [Joshua] any more vulnerable to them," we held that "*DeShaney* thus *suggests* that had the state created the danger, Joshua might have recovered." *L.W. v.*

*Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (emphasis added). From that suggestion, we read two distinct exceptions to the "general rule" that "members of the public have no constitutional right to sue state employees who fail to protect them against harm inflicted by third parties." *Id.* First, we have the established "special relationship" exception discussed in *DeShaney*, which requires custody of the plaintiff. *Id.* Second, we hatched a new "danger creation exception" that dispenses with any custodial requirement. *Id.* This latter exception creates liability for any conduct by a State actor that leads to harm by a third party if the State (1) "affirmatively place[d] the plaintiff in danger" (2) "with deliberate indifference to a known or obvious danger." *Murguia*, 61 F.4th at 1106 (simplified). Some of our cases add a third element: (3) "that the injury [the plaintiff] suffered was foreseeable." *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023).

Other circuits have followed suit in recognizing the "state-created danger" exception from *DeShaney*'s two sentences. *See Freeman v. Ferguson*, 911 F.2d 52, 54–55 (8th Cir. 1990); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993); *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993); *Uhlrig v. Harder*, 64 F.3d 567, 572 & n.7 (10th Cir. 1995); *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996); *Davis v. Brady*, 143 F.3d 1021, 1025 (6th Cir. 1998); *Butera v. District of Columbia*, 235 F.3d 637, 647–49, 651 (D.C. Cir. 2001); *Doe v. Rosa*, 795 F.3d 429, 438 (4th Cir. 2015); *Irish v. Fowler*, 979 F.3d 65, 73, 75 (1st Cir. 2020).

## C.

### The Concerns with the State-Created Danger Doctrine

Whatever the wisdom of the state-created danger doctrine, three related concerns arise from its origin and

application. First, we should be wary of recognizing a new constitutional right from such an uncertain source. Second, given the lack of a textual and historical mooring, we should be careful before extending it. From its beginnings in *DeShaney* to *Murguia* today, the doctrine has evolved along a course of repeated expansion—so much so that the Constitution now is the "font of tort law" the Court has told us to avoid. *Paul*, 424 U.S. at 701. Third, the circuit courts have varied wildly on how to apply the doctrine. With just a couple of lines from *DeShaney* to go on, circuit courts have—predictably—come up with diverging tests for determining when the exception applies.

I look at each concern in turn.

### i.

### The Court Does Not Hide Elephants in Mouseholes

Start with the obvious: Two sentences from *DeShaney* are not enough to disrupt the constitutional landscape. Just as Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), it's doubtful that the Supreme Court meant to fashion a novel theory of substantive due process liability through such incidental language.

Indeed, we turn *DeShaney* on its head by reading it to *create* a new affirmative duty on States when the thrust of the opinion reaffirms the strict *limits* of the Due Process Clause's substantive component. *DeShaney* rejected a broad view of substantive due process, observing that "nothing in the language of the Due Process Clause . . . requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195. To be sure, the Court acknowledged that its prior "special relationship"

cases recognize that the Constitution imposes "some responsibility" for the "safety and general well-being" of those that the State takes into its custody "against [their] will." *Id.* at 199–200 (citing the "*Estelle-Youngberg*" line of cases). Even if this doctrine extends beyond the custodial setting, the Court expressly held that it had no applicability in DeShaney's case because the State "played no part in th[e] creation [of the dangers to Joshua], nor did it do anything to render him any more vulnerable to them." *Id.* at 201.

Read as a whole, this discussion in *DeShaney* makes clear that the Court was not proposing a new exception. Rather, the Court was merely providing further explanation for why the special relationship exception did not apply— even if the doctrine extended outside the custodial context. It's no mistake that the language the Court uses—which courts now use to justify the state-created danger exception—also fits neatly within the special relationship exception. After all, if the State takes a person into custody and, as a result, that person faces dangers he would not have faced in the free world, the State is to blame for creating those dangers and for "render[ing] [that person] . . . more vulnerable to them." *Id.* At most, *DeShaney* suggests the "special relationship" exception could apply beyond just the custodial setting. But it reads too much into the decision to cut a new doctrine out of whole cloth.

## ii.

### The Expansion of the Doctrine

Our court's expansion of the state-created danger doctrine poses another reason for concern. We first invoked the doctrine in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). There, our court assessed whether a police officer's decision to arrest a driver, impound that driver's car, and

thereby strand the passenger in a high-crime area where she was later raped violated that passenger's right to due process. *Id.* at 589–90. Coming on the heels of *DeShaney*, we held that the passenger had raised a triable issue of fact as to whether the officer's actions violated due process by "affirmatively plac[ing] the plaintiff in a position of danger." *Id.* (simplified). While this case represents our first recognition of the state-created danger doctrine, its reach was modest because the officer was no doubt exercising an "exclusive sovereign prerogative," using the State's police authority to force the passenger into a dangerous situation. Pritchard, 74 Rutgers U. L. Rev. at 192.

But just three years later, our court expanded the state-created danger exception to cover any "affirmative conduct" of a government employee that places a plaintiff in danger. *Grubbs*, 974 F.2d at 121. In that case, an inmate at an Oregon state juvenile detention facility raped a nurse. *Id*. at 120. The nurse sued her State employers, arguing that they violated her due process rights by placing her with a known violent sex offender. *Id.* We concluded that the employers could face liability because they, "like the officer in *Wood*, . . . used their authority as state correctional officers to create an opportunity for [the inmate] to assault L.W. that would not otherwise have existed." *Id.* at 121. But the *Grubbs* court missed a critical distinction. Unlike the officer in *Wood*¸ who used *coercive State authority* to place the plaintiff in harm's way, the *Grubbs* employers were acting as, well, employers. Scheduling an employee for a shift, as any other private employer might, is nothing like an officer using police powers to place a person in danger.

Relying on *Grubbs*, we widened the state-created danger exception even more in *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (per curiam). The plaintiff in

that case was experiencing a medical emergency, prompting a 911 call from neighbors. *Id.* at 708. Two officers arrived and observed that the plaintiff needed medical care. *Id.* Even so, they canceled the request for paramedics, moved the plaintiff inside his house, locked the door, and left him there. *Id.* The plaintiff then died of respiratory failure. *Id.* We concluded that the officers violated the plaintiff's substantive due process rights because, even though they did not create any danger, they "increased the risk" the plaintiff faced. *Id.* at 710. In so doing, we rejected the distinction "between danger creation and enhancement" in favor of a distinction "between state action and inaction." *Id.* We thus eliminated yet another limiting principle—expanding the state-created danger exception to cover acts that merely *enhance* danger rather than *create* it.

*Martinez v. City of Clovis*, 943 F.3d 1260 (9th Cir. 2019), expanded the state-created danger doctrine even more by allowing any "affirmative actions"—even officers' remarks—to lead to state created-danger. In *Martinez*, a police officer responded to a domestic violence call, and while there, made "positive remarks" about the male abuser. *Id.* at 1273. Another officer who was there told the abuser that the victim "was not 'the right girl' for him." *Id.* at 1272. After the officers left, the abuser assaulted the victim later that night. *Id.* at 1269. We held that a jury could reasonably find that those officers' statements placed the victim in danger by "provok[ing]" or "embolden[ing]" the abuser. *Id.* at 1272. But, once again, the officers' statements didn't reflect coercive State authority. At most, the words were a suggestion that the officers would *not* act. But *DeShaney* makes clear that the Due Process Clause doesn't impose an affirmative duty to "guarantee . . . certain minimal levels of safety and security." 489 U.S. at 195. It thus makes little

sense to find liability in instances where the State suggests it
will not act, but not where the State provides no warning that
it will do nothing at all. And if "emboldening" a private
actor is enough to violate due process, it's hard to explain
*DeShaney*. There, the social workers repeatedly visited
Joshua's home without removing him despite clear signs of
abuse, eventually took temporary custody of Joshua, and
then returned Joshua to his father's custody, all of which
would have *emboldened* Joshua's father. *Id.* at 192–93.
*Martinez* thus highlights the problems with our court's
current reliance on mere "affirmative acts" to point to
substantive due process violations.

And *Murguia* marks an even greater expansion of the
doctrine. As Judge Ikuta points out, *Murguia* dispenses with
*any* requirement that the state-created danger doctrine
involve the "abuse of power entrusted to the state."
*Murguia*, 61 F.4th at 1124 (Ikuta, J., dissenting). Instead,
*Murguia* now creates a due process violation "based solely
on negligence and mistake." *Id.* Neither Sergeant Garcia
nor Torres exercised coercive government authority here.
First, there's no allegation that Sergeant Garcia forced
Langdon to stay at the motel that night. Second, Torres did
not use exclusive government authority in providing
Sergeant Garcia false information. And even if she did, she
didn't *abuse* State power because there's no allegation that
she intentionally sought to injure Langdon or the twins by
providing false information.

And so the doctrine continues to be "expanded . . . with
increasing momentum, to apply in a number of distinct
contexts involving state agents acting in their capacity as
employers or service providers of some kind." Pritchard, 74
Rutgers U. L. Rev. at 175. Now, "*any* government activity
can give rise to a state-created danger claim." *Id.* (emphasis

added). But we should recognize that each expansion is a step farther away from our Constitution's text and the Supreme Court's instructions. And with each extension we intrude further on States' rights to regulate the torts of their own officials. *See Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 919 (10th Cir. 2012) (noting the state-created danger doctrine's "osmotic, ill-considered tendency to invade the province of both common law negligence and state tort law"). So rather than display "the false modesty of adhering to a precedent that seized power we do not possess," we should instead exercise "the truer modesty of ceding an ill-gotten gain." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1943 (2021) (Gorsuch, J., concurring).

### iii.

### The Lack of Uniformity

Since *DeShaney*, nearly every circuit has adopted some form of the state-created danger exception. So one might think that in the interest of uniformity, we ought to go along with the trend. But don't be fooled. Practically every circuit that's endorsed the state-created danger exception has come up with a different test for when it should apply. One look at the variations is enough to make anybody question whether we've really "exercise[d] the utmost care . . . break[ing] new ground in this field." *Dobbs*, 142 S. Ct. at 2247 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Just see for yourself:

| 1st Cir. | (1) State affirmatively acts to create or enhance danger; (2) danger is specific to plaintiff; (3) State's act causes harm; and (4) State's conduct shocks the conscience. Level of culpability |
|---|---|

| | |
|---|---|
| | changes based on time the State has to act. *Irish*, 979 F.3d at 75. |
| 2d Cir. | (1) State's affirmative conduct creates or enhances danger to plaintiff; and (2) shocks the conscience. Sustained inaction by the State may constitute affirmative conduct. *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428, 431 (2d Cir. 2009). |
| 3d Cir. | (1) There is a relationship between State and person injured; (2) State affirmatively uses government authority to create danger; (3) the ultimate injury is foreseeable and fairly direct; and (4) State's conduct shocks the conscience. *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018). |
| 4th Cir. | (1) State affirmatively acts to create or increase the risk of harm to victim; and (2) State's conduct shocks the conscience. *Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 146, 149 n.5 (4th Cir. 2021). |
| 5th Cir. | State-created danger exception not recognized. *Fisher*, 62 F.4th at 916. |
| 6th Cir. | (1) Danger is specific to plaintiff; (2) State's affirmative act creates or increases danger; and (3) State knew or should have known of the danger. *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491–92 (6th Cir. 2019). |
| 7th Cir. | (1) State's affirmative act creates or increases a danger; (2) State's failure to protect the individual causes injury; and (3) State's conduct |

| | |
|---|---|
| | shocks the conscience. *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019). |
| 8th Cir. | (1) Plaintiff is member of limited and definable group; (2) State's conduct puts plaintiff at significant risk of serious harm; (3) risk is obvious or known; (4) State acts recklessly in conscious disregard of the risk; and (5) State's conduct shocks the conscience. *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 512 (8th Cir. 2015). |
| 9th Cir. | (1) State's affirmative actions create or expose plaintiff to danger; (2) the injury was foreseeable; and (3) State is deliberately indifferent. *Sinclair*, 61 F.4th at 680. No "shocks the conscience" requirement. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064–65 (9th Cir. 2006). |
| 10th Cir. | (1) Plaintiff is member of limited and definable group; (2) State creates or increases danger to plaintiff; (3) State puts plaintiff at substantial risk of serious proximate harm; (4) risk is obvious; (5) State acts with conscious disregard; and (6) State's conduct shocks the conscience. *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014). |
| 11th Cir. | Substantive due process violation if State's conduct is "arbitrary, or conscience shocking." *White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999). |
| D.C. Cir. | State's affirmative conduct leads to harm and shocks the conscience. *Butera*, 235 F.3d at 651. |

Of course, these varying tests for the same exception are no surprise when you consider the legal foundation on which they rest. A two-sentence aside in a single opinion is not a lot to go on. But like Dr. Frankenstein, courts have cobbled together bits and pieces of standards from other contexts to try to breathe new life into substantive due process after *DeShaney*. *See, e.g.*, *Wood*, 879 F.2d at 588 (pulling the "deliberate indifference" standard from Eighth Amendment context); *Uhlrig*, 64 F.3d at 573 (borrowing the "shocks the conscience" element from a case about a municipal § 1983 claim). And like his monster, the state-created danger exception roams menacingly among our circuit courts and is often difficult to comprehend. We should have done our part to contain this creation.

## D.

### The State-Created Danger Doctrine Revisited

By now, one point should be clear: the state-created danger doctrine needs a serious course correction. Courts, the States, and the people would be better off with clearer and more uniform guideposts to assess state-created danger claims. And we should stop the one-way ratchet of ever-expanding the doctrine. To fix things, we should return to the text of the Due Process Clause and *DeShaney*. If we are to continue to accept some form of the state-created danger exception, we must stick to the strict limits placed on it by both the Court and the Constitution.

As stated above, the best reading of *DeShaney*'s language concerning state-created danger is that the Court was *supplementing* its discussion of the special relationship exception—not carving out a new exception. What we now call the "state-created danger" exception is really a subset of the special relationship exception. And with that

understanding, we should recognize that state-created danger must follow the limits of the special relationship exception.  While *DeShaney* may expand this exception outside the purely custodial context, it does not untether non-custodial claims from all constitutional constraints.  Rather, at the heart of *DeShaney* was the understanding that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause."  489 U.S. at 200.

Thus, what triggers the due process protection is not *any* affirmative act by a State actor—as our precedent currently holds—but only an "affirmative act of restraining [an] individual's freedoms to act on his own behalf."  *Id.*  So, at a minimum, state-created danger claims must arise from some "restraint of personal liberty," like incarceration or institutionalization.  *Id.*  In other words, the State actor's conduct must amount to the abuse of *coercive* government power to trigger substantive due process liability under a state-created-danger theory.

As stated recently:

> [A]ffirmative action by a state agent is a necessary, but not a sufficient, condition to find a deprivation of liberty in the constitutional sense.  Every act of government is accomplished through a human agent.  As with all humans, government agents sometimes affirmatively act in ways that cause harm to others.  But not every such harm-causing act is a deprivation of liberty by the state.  That constitutional

> deprivation can occur only when the harm results from the state acting qua state—i.e., the government using its exclusive sovereign prerogative to coerce or restrain action through the threat or application of physical force.

Pritchard, 74 Rutgers U. L. Rev. at 192.

This understanding comes directly from our Constitution's text, which prohibits the "deprivation of liberty," and *DeShaney*, which explains that the Due Process Clause "was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.'" 489 U.S. at 196 (simplified). This emphasis on coercive State power explains the Court's decision in *DeShaney*. There, the social workers engaged in "affirmative acts" by visiting Joshua's home several times without removing him and then returning him home after a temporary custody. But those "affirmative acts" didn't constitute coercive State power and the social workers "placed him in no worse position than" had the State not acted at all. *Id.* at 201.

To summarize: plaintiffs can't just point to *any* affirmative act to state a due process claim; they must point to "the State's affirmative act of restraining the individual's freedom to act on his own behalf" to "trigger[] the protections of the Due Process Clause." *Id.* at 200. Only then can we say that there was some "arbitrary exercise of the powers of government." *Daniels*, 474 U.S. at 331 (simplified). After all, the Clause's purpose is "to protect the people from the State"—not to protect people from the negligence of State actors. *DeShaney*, 489 U.S. at 196; *see also Weiland v. Loomis*, 938 F.3d 917, 921 (7th Cir. 2019) (quoting *DeShaney* and suggesting that constitutional

liability arises from the State's limitation on a person's "freedom to act on his own behalf").  Following this limitation would keep federal courts from turning constitutional law into tort law—something the Supreme Court has made clear that we should not do.  *See Paul*, 424 U.S. at 701.

## III.

With the proper understanding of the state-created danger exception in mind, we may now turn back to Murguia's claims.  While Murguia experienced unspeakable tragedy, under the proper due process analysis, his state-created danger claims against Sergeant Garcia, Torres, Deputy Lewis, and Sergeant Cerda should have been dismissed.

## A.

### Claim Against Sergeant Garcia

Sergeant Garcia had the unfortunate role of arranging for a motel room for Langdon and the twins and then transporting them there.  Our court decided that these were sufficiently affirmative acts to state a due process claim. *Murguia*, 61 F.4th at 1113.  We presumed that Sergeant Garcia's actions increased the risk of harm to the twins by "remov[ing] them from the supervision of the Lighthouse staff and render[ing] the twins more vulnerable to physical injury by Langdon as a result of their isolation with her." *Id.* Our court also concluded that Sergeant Garcia acted with deliberate indifference because he "was aware that Langdon was undergoing a mental health crisis" and that "Langdon posed an obvious risk of physical harm to the twins based on her worrisome behavior." *Id.* at 1114.

But this analysis overlooks that Sergeant Garcia's affirmative acts lacked state authority. By arranging transportation and housing, Sergeant Garcia acted "as a chauffeur and a Good Samaritan—not as an instrument of the state." *Id.* at 1125 (Ikuta, J., dissenting). Murguia doesn't allege that Sergeant Garcia forced Langdon to be driven to the motel or to spend the night there. So nothing Sergeant Garcia did approached "restrain[ing] [Langdon's] personal liberty," like incarcerating or committing her. *DeShaney*, 489 U.S. at 200. And while Sergeant Garcia may have been negligent in trying to help the twins, his commonplace actions did not give rise to a constitutional violation merely because he was an employee of the State.

Because Sergeant Garcia did not exercise coercive state authority by driving Langdon and the twins to the motel and leaving them there, Murguia's § 1983 claim against Sergeant Garcia should have been dismissed.

## B.

## Claim Against Torres

Murguia accuses social worker Roxanne Torres of lying to Sergeant Garcia about Langdon's circumstances and history of abuse. In particular, Torres told Sergeant Garcia that Langdon had no history of child abuse and neglected to tell him about Murguia's availability to take custody of the twins. Our court concludes that providing Sergeant Garcia with false information violated due process because it "eliminat[ed] the most obvious solution to ensuring the twins' safety: returning them to [Murguia's] custody." *Murguia*, 61 F.4th at 1115. We speculated that, "[a]bsent Torres's affirmative misrepresentation, Garcia may have conducted an independent investigation into Langdon's

criminal history and living situation prior to settling on the decision to take the family to the motel." *Id.*

But our court conceded that Torres's affirmative acts merely consisted of "revealing certain information," *id.*—information that turned out to be wrong.  So again, we have an affirmative act that has nothing to do with the "restraint of personal liberty." *DeShaney*, 489 U.S. at 200.  In some respects, Torres acted only as a conduit of false information—like any website or social media app could.  Even if Torres falsely disseminated proprietary government information, her lies still didn't lead to the deprivation of Langdon's liberty.  Instead, our court holds her accountable based on the counterfactual assumption that Sergeant Garcia would have prevented the twins' deaths if only he received accurate information from Torres.

Again, Torres's actions may constitute negligence or fraudulent misrepresentation.  *See* Restatement (Second) of Torts §§ 304 ("A misrepresentation of fact or law may be negligent conduct."), 310 (stating that an actor who makes a misrepresentation is liable for physical harm of another person if that actor should know that his misrepresentation will likely induce action and knows that the statement is false).  But that Torres receives her paycheck from the State is not a valid basis for transforming a traditional tort into a constitutional deprivation.

## C.

### Claim Against Deputy Lewis and Sergeant Cerda

Although our court dismissed the claim against Deputy Lewis and Sergeant Cerda, that claim is actually the strongest of Murguia's claims.  Of the State actors involved, Deputy Lewis and Sergeant Cerda were the only ones who

used coercive government power.  *See Murguia*, 61 F.4th at 1124 (Ikuta, J., dissenting).   The deputies ordered Murguia to separate from Langdon and the twins once they arrived on scene.  They then let Langdon and the twins leave with Rosa while forcing Murguia to remain at home.  They even stayed outside Murguia's house for 30 minutes so that he could not follow Langdon and the twins.  Murguia alleged that he feared arrest if he disobeyed the deputies' commands. In other words, Deputy Lewis and Sergeant Cerda "restrain[ed] [Murguia's] freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.  Thus, of all Murguia's claims, the claim against these deputies is the only one that passes the threshold requirement of a deprivation of liberty.

Our court, however, dismissed the claim because the deputies "merely replaced one competent adult . . . with another competent adult" and so "the officers [did not leave] the twins in a situation that was more dangerous than the one in which they found them."  *Murguia*, 61 F.4th at 1113 (simplified).  Though it's a close call, I agree that Deputy Lewis and Sergeant Cerda did not violate Murguia's due process rights because of the lack of foreseeability.  *See Sinclair*, 61 F.4th at 680 (requiring a foreseeable injury to allege state-created danger).  So much more took place in the hours between the deputies' actions in restraining Murguia and the deaths of the twins.  As our court pointed out, the deputies left Langdon and the twins in the hands of Rosa, a "competent adult."  *Murguia*, 61 F.4th at 1113.  And the deputies could not have predicted the series of tragic bad judgments and mistakes made by the State and non-State actors who encountered Langdon and the twins over the next 24 hours.   Thus, without causation or foreseeability, Murguia's state-created danger claim against Deputy Lewis and Sergeant Cerda should ultimately fail.

## IV.

We should have seized this opportunity to correct our longstanding errors in applying the state-created danger doctrine. We could have put ourselves back on track with Supreme Court precedent and our Constitution's text. And the solution is a narrow and straightforward one—holding that only affirmative acts that cause the "deprivation of liberty" may suffice for a state-created danger claim. It is regrettable that our court has declined to take this textual approach.

I respectfully dissent from the denial of rehearing en banc.