**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GERALD ELMER NAPOUK,
individually, and as Co-Special
Administrator of the Estate of Lloyd
Gerald Napouk; MARY NAPOUK,
individually, and as Co-Special
Administrator of the Estate of Lloyd
Gerald Napouk; FREDRICK WAID,
as Co-Special Administrator of the
Estate of Lloyd Gerald Napouk,

       *Plaintiffs-Appellants*,

  v.

LAS VEGAS METROPOLITAN
POLICE DEPARTMENT; BUFORD
KENTON; CAMERAN GUNN,

       *Defendants-Appellees*.

No. 23-15726

D.C. No. 2:20-cv-
01859-JCM-BNW

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted April 2, 2024
Pasadena, California

Filed December 10, 2024

Before:  Ryan D. Nelson, Lawrence VanDyke, and Gabriel
P. Sanchez, Circuit Judges.

Opinion by Judge VanDyke;
Concurrence by Judge R. Nelson;
Dissent by Judge Sanchez

## SUMMARY[*]

### Qualified Immunity/Deadly Force

The panel affirmed the district court's summary judgment for two Las Vegas Metropolitan Police Department officers in an action arising from the fatal shooting of Lloyd Gerald Napouk.

The officers responded to reports of a man walking around a residential neighborhood in the middle of the night with a "machete" or a "slim jim," behaving suspiciously and walking up to cars and houses.  When they arrived, they attempted to engage Napouk for several minutes, but he refused to follow their commands and repeatedly advanced toward them with what the officers believed was a long, bladed weapon.  When Napouk advanced upon the officers a final time with the weapon, coming within nine feet of Sergeant Kenton, both officers fired their weapons, killing him.  Napouk's weapon turned out to be a plastic toy fashioned to appear as a blade.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Napouk's parents and estate sued, alleging excessive force in violation of the Fourth Amendment, deprivation of familial relations in violation of the Fourteenth Amendment, municipal liability based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and Nevada state law claims.

The panel held that the officers were entitled to qualified immunity from the Fourth Amendment excessive force claim. First, the totality of the circumstances based on the undisputed facts shows that Napouk posed an immediate threat to the officers at the moment they fired. No rational jury could find that the officers' mistake of fact as to Napouk's weapon, which objectively looked like a machete, was unreasonable. Second, as the district court determined, Napouk may have committed assault with a deadly weapon as the event unfolded by brandishing the object and refusing to respond to the officers' orders. Third, Napouk repeatedly failed to comply with the officers' orders to drop his weapon and to stop moving, and advanced toward the officers with the weapon. Accordingly, the officers' conduct did not violate the Fourth Amendment, but even if it did, they would still be entitled to qualified immunity because they did not violate clearly established law.

The panel held that plaintiffs' Fourteenth Amendment deprivation of a familial relationship claim failed because there was no evidence that the officers acted with anything other than the legitimate law enforcement objectives of self-defense and defense of each other.

Finally, plaintiffs' *Monell* claims failed because there was no constitutional violation and plaintiffs' state law claims failed because the officers were entitled to discretionary-function immunity under Nevada state law.

Judge R. Nelson concurred in the majority opinion and the conclusion to affirm the district court's dismissal of plaintiffs' Fourteenth Amendment substantive due process claim for deprivation of a familial relationship. In his view, substantive due process does not extend to the Napouks' relationship with their forty-four-year-old son.

Dissenting, Judge Sanchez stated that majority erred by failing to evaluate the evidence in the light most favorable to the nonmoving party and by minimizing evidence that, when properly credited, created genuine disputes of material fact. A rational trier of fact could find that the officers' use of deadly force was objectively unreasonable because Napouk did not pose an imminent threat to the safety of the officers, he was not committing a crime or resisting arrest, and several non-lethal alternatives were available to contain the slowly unfolding encounter. And Ninth Circuit caselaw clearly establishes that police officers may not kill a suspect who does not pose an imminent threat to the safety of officers or bystanders, is not committing any crime or actively resisting arrest, and in which non-lethal alternatives are available to the officers.

## COUNSEL

Peter Goldstein (argued), Peter Goldstein Law Corp, Las Vegas, Nevada, for Plaintiffs-Appellants.

Craig R. Anderson (argued) and Marquis Aurbach, Marquis Aurbach Coffing, Las Vegas, Nevada, for Defendants-Appellees.

# OPINION

VANDYKE, Circuit Judge:

Sergeant Buford Kenton and Officer Cameran Gunn responded to reports of a man walking around a residential neighborhood in the middle of the night with a "machete" or a "slim jim," behaving suspiciously and walking up to cars and houses. When they arrived, they attempted to engage Lloyd Gerald Napouk for several minutes, but he refused to follow their commands and repeatedly advanced towards them with what they believed was a long, bladed weapon. When he advanced upon them a final time with the weapon, coming within nine feet of Sergeant Kenton, both officers fired their weapons, killing him. Napouk's parents and administrators of his estate sued Kenton and Gunn and the Las Vegas Metropolitan Police Department (LVMPD), alleging constitutional and state law claims. Defendants moved for summary judgment, and the district court granted their motion, determining that the officers' use of force was reasonable as a matter of law. We affirm.

## I.

At around midnight on October 27, 2018, a bystander called the LVMPD nonemergency line to report that a white adult male was walking down Floating Flower Avenue with a "slim jim" or a "long stick," peering into cars, talking to himself, and raising his fist at the cars. Three minutes later, another bystander called 911 to report that an African American adult male[1] with a "machete," "big tool," or "piece of metal" was going door-to-door looking into houses,

---

[1] The callers made differing reports as to the man's race. In actuality, Napouk was Innuit.

talking to himself, and pointing the object at the houses. A few minutes later, the first bystander called again to report that the man had moved to Tender Tulip Avenue and was going into people's backyards and looking into windows. The bystander told the operator that he was armed and would shoot the man if he came into his yard.

A few minutes after the first call, Seargent Kenton and Officer Gunn, riding in separate patrol cars, assigned themselves to the call. According to the information they received from dispatch, a male wearing a baseball cap and camo backpack was walking around with a "slim jim," a "long stick," or "possibly a … machete," going door to door and peering into windows. A police helicopter was also dispatched.

When the officers arrived in the neighborhood, Gunn briefly spoke with the second bystander, who told him that Napouk was one street over and wearing sunglasses. The officers did not preplan or communicate before they interacted with Napouk. Both officers drove over to the next street, where Napouk came out from between two houses. Both officers thought Napouk was holding a machete. Gunn activated his patrol car lights and parked his car right in front of Napouk, and Kenton parked behind Gunn. Gunn exited his car with his gun drawn and stood near the driver side door, immediately telling Napouk to "put it on the ground," and drop it. He asked Napouk what was in his hand and repeated his command to drop it.

Kenton also exited his car, moved towards Napouk with his gun drawn, repeatedly asked Napouk what was in his hand, and told him to put it on the ground. Kenton also repeatedly commanded Napouk to remove the headphones from his ears while pointing to his own ears. Napouk stood

still for several seconds to the right of Gunn's patrol car, holding the long, black object at his side. Gunn reported that Napouk was not following commands and "saying we're gonna have to shoot him."

Napouk then walked slowly in front of and around to the driver side of Gunn's patrol car, where Gunn was standing, failing to follow the officers' commands to put the object down. Gunn retreated to stand behind the back of his patrol car, and both officers continued to repeat commands to "drop the knife." Napouk stood next to the driver side door of Gunn's patrol car and smoked a cigarette for over a minute, with Gunn positioned at the driver side bumper and Kenton on the passenger side at the hood of the car. The officers repeatedly told Napouk that "it's not worth it," that "it's all good, man. We can talk," and that "you're not in any trouble," and Kenton also tried asking his name. Kenton radioed during this time to request a beanbag shotgun and a canine unit and asked that medical be standing by. Napouk stayed in the same place and moved the long object in different positions, pointing it outward, up in the air, and straight out next to him.

After around two minutes standing in one place and failing to abide by the officers' commands, Napouk moved more quickly along the side of the car toward Gunn, telling the officers twice to "get out of here." Gunn retreated around the other side of the car, repeating his command to drop the weapon. Kenton followed Napouk around the car repeating commands to drop it. Napouk then turned and walked at Kenton, who retreated back to stand with Gunn at the passenger side near the hood of the car. Both officers said "I'm gonna shoot you," and Napouk responded "you have to." Gunn told Napouk if he took one more step towards them, "I will shoot you," and Napouk said, "I know."

Kenton told him again to drop it and "it's not worth it man," and again tried to ask his name and talk to him.

Napouk stopped at the front driver side of Gunn's patrol car for another minute, moving his hat around on his head and telling the officers to "get out of here," while the officers stood on the passenger side, continuing to repeat commands to drop it and attempting to ask his name. Eventually, he began slowly moving again, across the front of the car toward them. They again retreated, Gunn behind a parked car on the side of the road next to his patrol car, and Kenton to the back of Gunn's patrol car. Kenton again radioed to request that someone with a beanbag shotgun come in behind him.

Napouk continued to move slowly in their direction, changing his grip on the object a few times. The officers continued instructing him to put it down, and Kenton told him "I don't want to shoot you today." Napouk continued to move along the passenger side of Gunn's patrol car towards Kenton, positioning himself between the two officers. Gunn told Kenton to "watch your crossfire." Kenton told Napouk "one more step and you're dead," to which Napouk responded, "I know" and continued advancing. When Napouk was about nine feet away, the officers both shot him multiple times.

Other officers put a handcuff on Napouk and performed first aid and CPR immediately following the shooting, but Napouk was pronounced dead at the scene. After the shooting, it was discovered that the object was a plastic toy fashioned to appear as a blade. Napouk's toxicology report revealed that he had been high on methamphetamine.

Napouk's parents, individually and as representatives of his estate, sued LVMPD, Gunn, and Kenton. They allege

excessive force in violation of the Fourth Amendment, deprivation of familial relations in violation of the Fourteenth Amendment, several municipal liability claims based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and battery/wrongful death and negligence/wrongful death under Nevada law. The district court granted summary judgment for Defendants, determining primarily that the officers' use of force was reasonable as a matter of law. Plaintiffs appeal the district court's judgment on all except their municipal liability for failure to train claim.

## II.

"We review the grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party." *Edwards v. Wells Fargo & Co.*, 606 F.3d 555, 557 (9th Cir. 2010). We similarly review "the district court's conclusions regarding qualified immunity de novo" and consider "disputed facts in the light most favorable to the nonmoving party." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017); *Scott v. Harris*, 550 U.S. 372, 377 (2007).

## III.

Plaintiffs appeal the district court's grant of summary judgment on their claims of (1) Fourth Amendment excessive force; (2) Fourteenth Amendment deprivation of a familial relationship; (3) municipal liability for an unconstitutional custom, practice, or policy; (4) municipal liability based on ratification; (5) battery/wrongful death under Nevada law; and (6) negligence/wrongful death under Nevada law. We address these claims in turn.

### A.

Both officers are entitled to qualified immunity from the excessive force claim. Qualified immunity protects government officials from suit unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Here, neither prong is satisfied.

### 1.

Under the first prong, we must determine whether "the use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). We look at "whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted." *Id*. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

The Supreme Court has emphasized that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97.

Here, Kenton and Gunn each shot Napouk several times. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. Where, as here, deadly force, which "'implicates the highest level of Fourth Amendment interests,'" is used, "the issue is determining whether the governmental interests at stake were sufficient to justify it." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (quoting *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)).

The Supreme Court has provided three factors for determining the strength of the government's interest: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "most important" of these factors is "whether the suspect posed an immediate threat to the safety of the officers or others." *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014).

**a.**

Addressing the second and "most important" factor first, Napouk posed an immediate threat to the safety of the officers. *See id*.

**i.**

We first address Plaintiffs' contention that the district court erred in failing to conclude that a rational jury could find the officers' mistake of fact as to the machete unreasonable. Plaintiffs argue that there was a genuine factual dispute as to whether the officers' belief that Napouk

was holding a bladed weapon was reasonable. But no rational jury could find the officers' mistake unreasonable.

"Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution." *Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023) (quotation marks and citations omitted) (holding that officers' perception that a plastic, airsoft replica gun was a real firearm was not unreasonable). "When an officer's use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Id.* (quotation marks omitted) (citing *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)). "Whether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019) (alteration marks and quotation marks omitted) (quoting *Torres*, 648 F.3d at 1127).

Here, witnesses gave several different descriptions of the object Napouk held, which highlights that others were at least confused as to what the object was. The officers were told that Napouk had either a slim jim, long stick, or machete. When they arrived on the scene just after midnight, both officers asked Napouk what was in his hand, and he failed to respond. Kenton told him at various points to drop "the knife" and "the weapon," while Gunn testified at a deposition that he perceived the object to have a metal blade because of the way light reflected off of it. Pictures and reports of the object confirm that at twenty-two inches long, made of layers of dark gray plastic adhered together and square at the end, and with a handle made of wire and yellow rope covered in black tape, the object was a "homemade plastic sword." Even Plaintiffs describe the object in their

complaint as a "toy sword wrapped in duct tape" and a "machete shaped instrument." Put simply, the item objectively looked like a machete, and no rational jury could find Kenton or Gunn's mistake unreasonable. *See S.R. Nehad*, 929 F.3d at 1134**.**

Plaintiffs' cases to the contrary are unavailing. First, in *Torres v. City of Madera*, an officer mistook her own pistol for her taser and shot a suspect—obviously a different situation from here. 648 F.3d at 1120. In *S.R. Nehad v. Browder*, an officer shot a suspect who he thought was approaching him with a knife, even though he never saw a knife and the suspect turned out to have only a blue metallic pen. 929 F.3d at 1131. In *Wilkins v. City of Oakland*, officers mistook an undercover officer arresting a suspect for "a civilian threatening another civilian with a gun." 350 F.3d at 955. In each of these cases, certain circumstances, such as special training or warnings from others on the scene, put the officer "on notice" that their belief might be mistaken, such that they "should have known." *Torres*, 648 F.3d at 1125, 1127. Here, no such facts alleged by Plaintiffs suggest circumstances by which the officers should have known the object, which was obviously made to look like a knife, was not actually a knife. Therefore, no rational jury could find the officers' mistake unreasonable.

### ii.

With the mistake of fact addressed, this becomes a straightforward case. As already explained, we assess reasonableness "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. As the officers reasonably perceived it, Napouk was holding a long, bladed weapon, walking toward one of them and failing to follow commands to stop or to drop the weapon. At the moment

they fired, Napouk was within ten feet of them, had ignored their commands for more than five minutes, and had moved at them several times, causing them to retreat with increasing frequency as the encounter went on. *See Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (noting that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force").

Our court has previously found it objectively reasonable to view an individual as an immediate threat in similar situations. In *Blanford v. Sacramento County*, our court addressed a case similar to this one. 406 F.3d 1110 (9th Cir. 2005). Officers responded to reports of a man wandering through a suburban neighborhood carrying a sword and "behaving erratically." *Id*. at 1112. The court determined that it was objectively reasonable for officers to view him as an immediate threat when he was attempting to enter a home and failed to comply with verbal commands to stop and to drop the sword. *Id*. at 1116. Here, Napouk similarly was found wandering streets and behaving erratically while carrying what appeared to be a long, bladed object, and similarly failed to comply with verbal commands to stop and drop the object. And in *Lal v. California*, officers were approached by a suspect holding a "football-sized rock" over his head. 746 F.3d at 1112, 1115, 1117. This court held that the officers were justified in their belief that he posed an immediate threat when he advanced on them. *Id*. Here, Napouk approaching the officers with what they reasonably perceived to be a long, bladed weapon was reasonably perceived as posing an even greater threat than a suspect with a rock.

Plaintiffs make several arguments as to why Napouk did not present an immediate threat, but none are convincing.

First, they argue that Napouk did not pose an immediate threat because he did not wave the object in a "threatening manner." For this they cite *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011), and *George v. Morris*, 736 F.3d 829 (9th Cir. 2013). But none stands for the broad, sweeping proposition for which Plaintiffs cite them, and each is distinguishable. In *Hayes*, officers encountered a suspect in his kitchen. 736 F.3d at 1227. When he complied with an officer's command to show his hands, revealing that he was holding a knife, pointed tip down, they immediately shot him. *Id*. at 1228. In *Glenn*, officers responded to reports of a suicidal and intoxicated man holding a pocketknife. 673 F.3d at 873. When the officers arrived, they positioned themselves a few feet from him and made sure all other bystanders were out of the way. *Id*. at 874. Though he did not respond to their commands to drop the pocketknife, he stayed in the same position, holding the pocketknife to his own neck, and made no sign of moving until the officers fired upon him. *Id*. at 873–74. And in *Morris*, police responded to a report of a man with a gun at his house. *Morris*, 736 F.3d at 832. When they arrived, the officers spotted the man, who had terminal brain cancer, using a walker on his balcony and holding a gun in his hand with the barrel pointed down. *Id*. at 832–33. There was a dispute of fact as to whether the man lifted the gun and whether he was even physically capable of wielding it. *Id*. at 833, 835.

Those cases stand for the proposition that the mere fact alone "that the suspect was armed with a deadly weapon does *not* render the officers' response per se reasonable under the Fourth Amendment." *Id*. at 838 (internal quotation marks omitted). That makes imminent sense. Many law-

abiding individuals possess weapons for a variety of legitimate purposes, and such mere possession has never alone justified the use of deadly force by law enforcement. But none of those cases supports Plaintiffs' very different proposition that an armed individual can pose a threat *only* when that person brandishes the weapon in a "threatening manner." Courts have repeatedly rejected that unreasonable argument. "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838; *see also Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) (The court determined that even if the suspect had not raised his hatchet before he was shot, he posed an immediate threat because he was close to and approaching the officers and "could have raised the hatchet in another second or two and struck [the officer] with it. Whether the hatchet was at [his] side, behind his back, or above his head doesn't change that fact."). Instead, the cases simply look at the totality of the circumstances to determine whether each individual who was holding a weapon was reasonably perceived as posing a threat at the moment the officer acted. *Glenn*, 673 F.3d at 872; *Hayes*, 736 F.3d at 1233–1234; *George*, 736 F.3d at 838. Unlike *Glenn*, *Hayes*, and *George*, the undisputed facts here show that Napouk had repeatedly disobeyed commands to stop moving toward the officers and to drop the weapon. By telling him that they would shoot him if he took another step, the officers clearly indicated to him their reasonable perception that they saw further deliberate movement toward them with the weapon as a threat. Rather than comply with their repeated commands, Napouk continued to hold the object, moving it around and pointing it in various directions, and continued to deliberately advance toward them.

Second, Plaintiffs argue that there was at least a dispute of fact as to Napouk's pace when he advanced towards the officers. They claim that while the district court's order describes Napouk as walking at "variable paces," the officers described Napouk's pace as "slow" and said that it did not change. But whether his pace was the same during his final approach as it was throughout the entire encounter is a red herring obscuring the facts that actually matter. What matters is that regardless of whether Napouk's pace was "slow" as a subjective matter, and regardless of whether Napouk varied his pace at some point, Plaintiffs do not—and cannot—dispute that when the officers fired, Napouk was within nine feet and deliberately advancing on the officers with what they reasonably perceived to be a long, bladed weapon in his hand.

Third, Plaintiffs assert that Napouk did not make "indirect verbal threats," or "becom[e] increasingly irritated" as the district court's order described. But again, even accepting Plaintiffs' view in this regard does not change the calculus. Napouk was behaving erratically, holding what the officers reasonably perceived to be a lethal weapon, repeatedly ignoring their commands to stop and to drop it, and repeatedly deliberately advancing toward them with the weapon in his hand. Those facts and circumstances, regardless of whether he verbally threatened them or became increasingly irritated, show an immediate threat.

Fourth, Plaintiffs claim that the officers "created their own sense of urgency and unnecessary haste." Of course, "an officer's poor judgment or lack of preparedness [can] cause[] him or her to act unreasonably, with undue haste." *S.R. Nehad*, 929 F.3d at 1135 (quotations omitted). But the undisputed facts clearly show that is not this case. The officers laudably responded quickly to reports of an armed

individual walking around a neighborhood, looking in cars and going up to houses. After they found him, they spent more than five minutes attempting to engage with him and convince him to drop his weapon. Only when he deliberately advanced on them a final time, putting himself in a position where the officers were concerned about crossfire, did they finally engage.

Finally, the Plaintiffs claim that the officers had "ample opportunity to reposition [or] withdraw," and therefore they should have again retreated instead of shooting. For this proposition, Plaintiffs again cite *Glenn*. But in that case, the suspect "stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon." 673 F.3d at 874. So *Glenn* does not involve a situation like this one where officers repeatedly retreated (at least four times) and attempted to engage and reason with Napouk, who continually advanced upon them. And *Deorle v. Rutherford*, the other case Plaintiffs cite, similarly does not stand for the obviously wrong proposition that officers must indefinitely retreat if able. 272 F.3d 1272 (9th Cir. 2001). In *Doerle*, the suspect "had not harmed or attempted to harm anyone" in the time the officer observed him, had dropped his crossbow as the officer instructed, and was walking with only a can or bottle in his hand. *Id*. at 1281–82. Based on all the facts and circumstances, there was "no immediate need to subdue" the suspect at the moment the officer used force against him. *Id*. at 1282. So again, the situation was substantially different from the one Kenton and Gunn faced.**[2]** Officers "need not

---

[2] The dissent mistakenly characterizes our analysis as relying on factual distinctions between this case and certain other cases—namely *Glenn*,

avail themselves of the least intrusive means of responding to an exigent situation," *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), and we decline to create a rule by which officers have a duty to indefinitely retreat when faced with an immediate threat. *Cf. Reed v. Hoy*, 909 F.2d 324, 331 (9th Cir. 1989) ("[S]uch a duty may be inconsistent with police officers' duty to the public[.]"), *overruling on other grounds recognized by Edgerly v. City & County of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010).

In sum, the totality of the circumstances based on the undisputed facts in this case shows that Napouk posed an immediate threat to the officers at the moment they fired.

### b.

Next, we address the severity of the crime at issue. This court often has "used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *S.R. Nehad*, 929 F.3d at 1136 (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017)). As the district court determined, Napouk may have committed assault with a deadly weapon as the event unfolded by brandishing the object and refusing to respond to the officers' orders. Nev. Rev. Stat. § 200.471(1)(a), (2)(b) ("Assault means: (1) Unlawfully attempting to use physical

---

*Hayes*, and *George*—to "reject[] Plaintiffs' evidence" in this case. But we do not "reject" Plaintiffs' evidence. Indeed, this opinion repeatedly cites Plaintiffs' evidence as true. Rather, we merely explain that Plaintiffs' evidence fails to create any dispute of material fact about whether Napouk was an imminent threat—he clearly was. We distinguish the facts of other cases simply to demonstrate why this case does not warrant the same legal conclusion reached in those cases, and why the different facts in those cases failed to demonstrate the presence of an "imminent threat" while the dissimilar facts of this case *do* rise to that level.

force against another person; or (2) [i]ntentionally placing another person in reasonable apprehension of immediate bodily harm."). This is a sufficiently serious and dangerous crime. As explained above, that the weapon turned out to be plastic has no bearing on the severity of the crime because the officers on the scene reasonably believed it was real. *See Graham*, 490 U.S. at 396.

**c.**

The final *Graham* factor asks whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Id*. As discussed above, Napouk repeatedly failed to comply with the officers' orders to drop his weapon and to stop moving, and advanced toward the officers with the weapon.

Plaintiffs cite *Young v. County of Los Angeles*, arguing that because the officers never explicitly told Napouk that he was under arrest, he could not have resisted arrest. 655 F.3d 1156 (9th Cir. 2011). But the circumstances of this case are unlike *Young*, where an officer pepper sprayed and hit a suspect with a baton who was sitting on a curb and "eating his broccoli." *Id*. at 1159. The subject there had been pulled over for a seatbelt violation and while the officer wrote his citation, he exited his truck to give the officer his registration. *Id*. Rather than "just hav[ing] a seat in the truck" as the officer instructed, he sat down on the sidewalk. *Id*. The officer never warned him that failure to comply would result in force or arrest, *id*. at 1165, whereas Kenton and Gunn warned Napouk that further noncompliance with their orders would necessitate use of force. And unlike this case, where Napouk was actively resisting orders and deliberately moving toward the officers with a bladed weapon, "Young was not being placed under arrest nor

attempting to flee when [the officer] began to pepper spray him." *Id*.

This case is also unlike *Glenn*, where the court determined that the suspect did not actively resist arrest because he "stayed in the same position from the time officers arrived and took no threatening actions (other than noncompliance with shouted orders)." 673 F.3d at 874–75. Napouk refused to follow the officers' orders to stop moving towards them and to drop the weapon. And unlike *Glenn*, where there was genuine dispute over whether the suspect "heard or understood those orders" to drop his pocketknife, *id*. at 875, here, Napouk is heard on the body camera footage from both officers responding to their commands. For example, when Kenton told Napouk "one more step and you're dead," Napouk responded, "I know." Therefore, Napouk actively resisted the officers' orders, satisfying *Graham*'s final factor.

**d.**

Plaintiffs nevertheless argue that other factors suggest the officers' use of force was unreasonable, including Napouk's mental state, the availability of less lethal means, and the lack of an effective warning. To start, while we have recognized that these other factors are relevant when evaluating the totality of the circumstances, *Glenn*, 673 F.3d at 872, they do not overcome the *Graham* factors to prove a constitutional violation where all three *Graham* factors favor the officers' use of force. But even if they could, each weighs in the officers' favor in this case.

First, though "whether the officers were or should have been aware that [the suspect] was emotionally disturbed" is a relevant consideration, *Glenn*, 673 F.3d at 875, we do not have "two tracks of excessive force analysis, one for the

mentally ill and one for serious criminals," *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010). Plaintiffs are correct that this court has said that "when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle*, 272 F.3d at 1283. But that is true only "where such an individual is neither a threat to himself nor to anyone else." *Bryan*, 630 F.3d at 829; *see also Glenn*, 673 F.3d at 875–76 (emphasizing that the suspect was not "brandishing [his pocketknife] at his parents or friends"). For example, in *Bryan*, the suspect had no weapon, "never addressed" the officer, and "remained stationary at a distance of approximately twenty feet." 630 F.3d at 828. That he was also "yelling gibberish and hitting his thighs" such that the officer believed he "may have been mentally ill" did not increase the government interest in using force against him. *Id*. at 822, 829.

In a case like this one, on the other hand, where the suspect is brandishing what is reasonably understood to be a lethal weapon and advancing towards the officers, that he was emotionally disturbed does not negate the serious threat he exhibited. If anything, his mental state and erratic behavior made Napouk more of a threat to the officers because he clearly was not behaving rationally or in a predictable manner *when he repeatedly approached them with a bladed weapon*. Therefore, under these circumstances, Napouk's mental state does not lessen the government interest in the use of force.

Second, Plaintiffs relatedly contend that because of Napouk's mental state, the officers should have made a

"greater effort to take control of the situation through less intrusive means."  But as we have repeatedly stated, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."  *Scott*, 39 F.3d at 915.

Here, the officers made a concerted effort to deescalate the situation and use alternative means.  The officers tried to engage and reason with Napouk for more than five minutes, and they repeatedly retreated as Napouk deliberately advanced toward them.  They tried to deescalate by saying things like "it's all good, man. We can talk," and "you're not in any trouble," and Kenton tried several times to ask Napouk's name.  Kenton also radioed to request a beanbag shotgun and a canine unit, and then followed up shortly before the situation escalated to request them a second time.

Only when Napouk advanced upon them a fifth time with what they reasonably believed was a long, bladed weapon, putting himself on a path where he could end up between Kenton and Gunn such that they were concerned about crossfire, failed to follow commands to drop it and stop, and came within nine feet of Kenton did the officers use deadly force.  That the officers did not retreat another time to wait for the less lethal means they requested does not make their actions unreasonable.  Nor does the mere fact that tasers were available make the officers' use of a gun to protect themselves from a perceived deadly threat unreasonable.  *Glenn*, 673 F.3d at 876.

Finally, Plaintiffs argue that the officers failed to give effective warnings.  "In general, we have recognized that an officer must give a warning before using deadly force 'whenever practicable.'"  *Gonzalez v. City of Anaheim*, 747

F.3d 789, 794 (9th Cir. 2014).  Plaintiffs do not dispute that
the officers repeatedly warned Napouk that they would shoot
him if he came closer, but they argue that Napouk was
wearing headphones, so the warnings may not have been
effective.  This is refuted by the record.  When the officers
warned Napouk that they would shoot, Napouk responded
by saying "you have to" and "I know."  Plaintiffs also point
out that Kenton and Gunn failed to identify themselves as
officers.     While they are correct that this may be a
consideration, *see S.R. Nehad*, 929 F.3d at 1138, here, the
officers were uniformed, and both pulled up right in front of
Napouk in their patrol vehicles with the lights on.  No
rational juror would believe he did not know they were
officers.  Based on these facts, no rational jury could
determine that the officers failed to give effective warnings.

* * *

For these reasons, the totality of the circumstances leads
us to conclude that the officers' use of force was reasonable.
*Glenn*, 673 F.3d at 872 ("We examine the totality of the
circumstances and consider whatever specific factors may be
appropriate in a particular case ...." (quotations omitted)).
Napouk may not have been a threat if he simply possessed
what they believed was a bladed weapon, or stood in one
place, or merely failed to comply with their commands to
drop the weapon.  But he deliberately advanced toward the
officers with what they believed was a long, bladed weapon
and repeatedly ignored their commands to drop it and to stop
moving.    Viewed holistically, these facts justified the
officers' use of force.

## 2.

The officers' conduct did not violate the Fourth
Amendment, but even if it did, they would still be entitled to

qualified immunity because they did not violate clearly established law.  To be clearly established, there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). While in the "rare" case a clearly established right may be obvious, clearly establishing a right usually requires "'controlling authority' or a robust 'consensus of cases of persuasive authority.'"  *Wesby*, 583 U.S. at 63, 64 (quoting *al-Kidd*, 563 U.S. at 741–42).  The burden is on Plaintiffs, *Isayeva*, 872 F.3d at 946, to show that "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it," *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (citation omitted).

According to Plaintiffs, "*Bryan*, *Drummond*, *Deorle*, *Gonzalez*, *Harris*, *Young*, and *Glenn* … clearly established the principles that render the deadly force unreasonable." But as discussed above, *Bryan*, *Deorle*, *Young*, and *Glenn* are distinguishable.  In *Bryan*, *Young*, and *Glenn*, none of the suspects advanced towards the officers.  *Bryan*, 630 F.3d at 828 (noting that the suspect "remained stationary at a distance of approximately twenty feet"); *Young*, 655 F.3d at 1164 (noting that suspect was "sitting on the sidewalk"); *Glenn*, 673 F.3d at 874 (noting that the suspect "stayed in the same position from the moment officers arrived and showed no signs of attempting to move until after he was fired upon").  And in *Bryan*, *Young*, and *Deorle*, the suspect did not have a weapon.  *Bryan*, 630 F.3d at 826 ("It is undisputed that Bryan was unarmed, and, as Bryan was only dressed in tennis shoes and boxer shorts, it should have been apparent that he was unarmed."); *Young*, 655 F.3d at 1166 (noting suspect was "armed only with broccoli and a

tomato"); *Deorle*, 272 F.3d at 1281 ("Deorle had discarded his crossbow following Rutherford's instructions to do so, and carried only a bottle or a can with him.").

*Drummond*, *Gonzalez*, and *Harris* are similarly distinguishable.  In *Drummond ex rel. Drummond v. City of Anaheim*, officers "allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance."  343 F.3d 1052, 1061 (9th Cir. 2003).  In *Gonzalez v. City of Anaheim*, after a skirmish during a traffic stop, an officer ended up inside a car with a suspect, who was unarmed.  747 F.3d at 792.  The suspect shifted the car into drive and attempted to flee, with the officer in the passenger seat, and the officer shot the suspect in the head.  *Id*. at 792–93.  There was a genuine dispute of fact as to how quickly the car took off, and therefore whether the officer or anyone else was in danger.  *Id*. at 796.  And *Harris v. Roderick* concerns the FBI's actions at Ruby Ridge.  126 F.3d 1189, 1192 (9th Cir. 1997).  There, the court denied qualified immunity to an agent who shot without warning or opportunity to surrender a suspect who "made no aggressive move of any kind," and was running back to the safety of his cabin.  *Id*. at 1203.  In none of these cases did the undisputed facts show an armed man deliberately advancing upon officers.  Therefore, none of the cases clearly establish that the officers would violate Napouk's constitutional rights by firing at him as he intentionally approached with a weapon and refused to drop it.

Finally, at argument, Plaintiffs discussed *Hayes*.  But as already discussed, the suspect in *Hayes* revealed the knife by complying with the officers' commands to show his hands,

and the officers immediately shot him without giving him a warning to stop or to drop the knife.  736 F.3d at 1227–28.  So again, *Hayes* is factually dissimilar to this case, where the officers repeatedly ordered Napouk to stop and to drop his weapon and acted with deadly force only when he refused and deliberately approached within a few feet of them.  Therefore, the officers here are entitled to qualified immunity.

**B.**

Plaintiffs' Fourteenth Amendment deprivation of a familial relationship claim also fails.  In the Ninth Circuit, an adult decedent's parents have the right to assert a substantive due process claim for the deprivation of the companionship of their child.  *Sinclair v. City of Seattle*, 61 F.4th 674, 678–79 (9th Cir. 2023).  Even assuming arguendo that such a claim exists based on these facts, where Napouk was an adult in his forties, *id*. at 685–86 (Nelson, J., concurring), only "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1132–33 (9th Cir. 2017) (alterations in original) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  "Where actual deliberation [by the officers] is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson*, 610 F.3d at 554.  But where, as here, "a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*.; *see also Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) (applying the second standard to a "five-minute altercation" between the suspect and the officer that was "quickly evolving and

escalating, prompting repeated split-second decisions" (internal quotations omitted)).

Here, assuming Plaintiffs could assert a substantive due process claim based on the death of their forty-four-year-old son, and that they could succeed in making out an excessive force claim, there is no evidence that the officers acted with anything other than the legitimate law enforcement objectives of self-defense and defense of each other. *Id*. at 1140 (to shock the conscience, the officer's purpose must be "to cause harm unrelated to the legitimate object of arrest" (quotation omitted)). Thus, the Fourteenth Amendment claim fails.

## C.

Plaintiffs also appeal dismissal of their *Monell* claims alleging municipal liability for an unconstitutional custom, practice, or policy and municipal liability based on ratification. Under *Monell*, a municipality is liable for constitutional torts committed by its employees only if those torts were committed pursuant to the municipality's policies or customs. *Henry v. County of Shasta*, 132 F.3d 512, 517 (9th Cir. 1997). A municipality is liable only if (1) "the [plaintiff] possessed a constitutional right of which he was deprived;" (2) "the municipality had a policy;" (3) "this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right;" and (4) "the policy is the 'moving force behind the constitutional violation.'" *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 835 (9th Cir 1996). Here, because we have found no constitutional violation, we also affirm the district court's grant of summary judgment on the *Monell* claims. *See Hayes*, 736 F.3d at 1231 (noting that a constitutional violation is required for *Monell* liability).

### D.

Plaintiffs also bring battery and negligence claims under Nevada law. Nevada's discretionary immunity statute "precludes claims against state officers based on acts or omissions relating to a 'discretionary function,' even if that discretion is abused." *Jones*, 873 F.3d at 1133. Under Nevada law, state actors are entitled to discretionary-function immunity if their decision "(1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir. 2014) (cleaned up) (quoting *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007)). "But decisions made in bad faith, such as 'abusive' conduct resulting from 'hostility' or 'willful or deliberate disregard' for a citizen's rights, aren't protected under the immunity statute even if they arise out of a discretionary function." *Jones*, 873 F.3d at 1133.

Here, the officers' actions fell within the discretionary function as it has been applied by Nevada's courts. *See Sandoval*, 756 F.3d at 1169 (applying discretionary immunity to most police actions during an interaction with three suspects); *see also Gonzalez v. Las Vegas Metro. Police Dep't*, No. 61120, 2013 WL 7158415 (Nev. 2013) (applying discretionary immunity to police actions in detaining and arresting a suspect). And because we have already determined that the officers acted reasonably and there is no evidence that they acted with bad faith, that immunity applies. *See Jones*, 873 F.3d at 1133. Therefore, the district court properly granted summary judgment on the state law claims.

## IV.

Plaintiffs have not shown that Kenton's or Gunn's actions were objectively unreasonable in violation of Napouk's Fourth Amendment rights or that such rights were clearly established.  Therefore, the district court properly granted summary judgment on the Fourth Amendment claim.  And because the officers acted reasonably, the district court also properly granted summary judgment on the Fourteenth Amendment, *Monell*, and state tort claims.

**AFFIRMED.**

R. Nelson, J., concurring:

I concur in the majority opinion and the conclusion to affirm the district court's dismissal of Plaintiffs' substantive due process claim.  In my view, however, substantive due process does not extend to the Napouks' relationship with their forty-four-year-old son.  Our circuit has recognized a substantive due process right to the companionship of one's adult children in limited circumstances.  *See, e.g.*, *Sinclair v. City of Seattle*, 61 F.4th 674, 679 (9th Cir. 2023).  In doing so, we have created a split with other circuits.[1]  And our holding that plaintiffs have such a right finds no basis in the text, history, or tradition of the Fourteenth Amendment.  Our

---

[1] *Compare Valdivieso-Ortiz v. Burgos*, 807 F.2d 6, 8–9 (1st Cir. 1986), *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003), *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005), *Robertson v. Hecksel*, 420 F.3d 1254, 1259–60 (11th Cir. 2005), *and Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) (all finding no such substantive due process right), *with Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe. Cnty.*, 768 F.2d 1186, 1188–89 (10th Cir. 1985) (finding right to familial relations under the First, not the Fourteenth, Amendment).

ahistorical precedent should not be extended beyond the narrow circumstances in those prior cases.

The Supreme Court has recognized that states may not unjustifiably interfere with the "formation and preservation of certain kinds of highly personal relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). These include those that "attend the creation and sustenance of a family," including the rearing of children. *Id.* at 619; *accord Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *May v. Anderson*, 345 U.S. 528, 533 (1953). That interest protects a parent's autonomy to decide questions related to the "custody, care and nurture of the child." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (same).

Following these principles, we first held in *Morrison v. Jones*, 607 F.2d 1269, 1275 (9th Cir. 1979) (per curiam), that a parent's relationship with her child is constitutionally protected. There, county officials deported the plaintiff's minor son, a German ward of the state, on the grounds that the plaintiff could not adequately care for her child. *Id.* at 1272. The plaintiff brought a § 1983 action alleging deprivation of her parental rights without due process of law. *Id.* at 1271. We held that the plaintiff had a constitutional interest in "preserv[ing] her access to [her] child." *Id.* at 1275. *Morrison* was rooted in the same basic principle that a parent has a protected custodial interest in her child.

We have affirmed *Morrison*'s holding that parents have a protected custodial interest in the companionship and society of their minor children. *See, e.g.*, *Kelson v. City of Springfield*, 767 F.2d 651, 653 (9th Cir. 1985); *Wallis v. Spencer*, 202 F.3d 1126, 1131–36 (9th Cir. 2000). But we

did not stop there. Breaking from most of our sister circuits, we extended this right to reach a parent's relationship with an adult child. *See, e.g.*, *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998); *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008). In these three cases, we simply accepted that the plaintiff parents had a constitutionally protected right to their relationship with their adult children. But we cited no special reason why. We took no pains to explain how the parents' relationship with their adult child bears on the custody, care, and nurture of that child. *Cf. Stanley*, 405 U.S. at 651. For example, we did not discuss that special circumstances, such as the adult child's age or living arrangements, may allow his parents to assert a constitutional right to a familial relationship. Nor did we ground such a conclusion in the Constitution's text or our Nation's history and tradition. These cases are pure judicial ipse dixit.

I have already explained why trying to ground this constitutional right in the Constitution's text or our Nation's history and tradition would be a losing enterprise. *Sinclair*, 61 F.4th at 684–86 (R. Nelson, J., concurring). "The Supreme Court has admonished that we must be wary of recognizing new substantive due process rights 'lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences' of judges." *Id.* at 685 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "Before recognizing a substantive due process right, the Court requires 'a careful description' of the asserted right and then a determination that it is 'deeply rooted in this Nation's history and tradition.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720–21).

Even so, we were bound in *Sinclair* by precedent to hold that the plaintiff had a valid liberty interest in her relationship with her nineteen-year-old son.  61 F.4th at 679.  We reiterated, however, that *Strandberg*, *Moreland*, and *Porter* were not well-reasoned, suggesting that we would not be bound by them in a later case with fewer factual "similarities" to them.  *Id.*

This is such a case.  George Lloyd Napouk was forty-four years old when he died.  His parents live thousands of miles from where Napouk resided.  Thus, while their grief is justifiably still great, they lack the custodial parent-child relationship that we held in *Sinclair* was constitutionally protected.    I  would  not  extend  *Sinclair*  to  these circumstances.  *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 318 (2000) (Rehnquist, C.J., dissenting) (we should not "distort[] existing precedent" where it would be "[un]faithful to the meaning" of the Constitutional text).  We may be bound by ahistorical precedent.  But we should not extend ahistorical precedent when it otherwise violates our Nation's  history  and  tradition.    *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 945–46 (9th Cir. 2021) (R. Nelson, J., dissenting from denial of rehearing en banc) (precedent should not be extended when it is "ahistorical [and] atextual"); *see also Murguia v. Langdon*, 73 F.4th 1103, 1108–18 (9th Cir. 2023) (Bumatay, J., dissenting from denial of rehearing en banc) (we should follow "Supreme Court precedent and our Constitution's text" rather than extend "atextual and ahistorical expansion[s] of substantive due process rights"); *Texas v. Rettig*, 993 F.3d 408, 417 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc) ("[O]ur duty [is] to apply the Constitution—not extend precedent.").

As part of our Nation's history and tradition, the right to "establish a home and bring up children" was "recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399. Given this, the Supreme Court has held that the Constitution protects the relationships that "attend the creation and sustenance of a family," such as "the raising and education of children," and "cohabitation with one's relatives." *Roberts*, 468 U.S. at 619.

But that history and tradition does not extend to the circumstances here. The Napouks had long ago raised their son. And they were not cohabitating with him—they were thousands of miles away. Nor do the Napouks identify any other special reason that their parent-child relationship is of a custodial nature warranting constitutional protection. Nothing in our Nation's "history and tradition" recognizes a constitutionally protected liberty interest in this type of relationship with a forty-four-year-old son. We should decline to recognize one here, particularly since it reflects an extension of our atextual and ahistorical precedent. *Cf. Glucksberg*, 521 U.S. at 720.

For these reasons, the Napouks have no substantive due process claim for familial relations. *Sinclair*—while faithful to our precedent—was wrongly decided as a matter of first principles. *See Sinclair*, 61 F.4th at 684–86 (R. Nelson, J., concurring). But even under *Sinclair*, there is no substantive due process right here. We should correct our prior erroneous precedent, including *Sinclair*, en banc in the appropriate case. *See id.* at 686.

SANCHEZ, Circuit Judge, dissenting:

Shortly after midnight on October 27, 2018, Las Vegas police Sergeant Buford Kenton and Officer Cameran Gunn fired their service weapons at Lloyd Gerald Napouk, a mentally impaired man holding a homemade plastic sword on an empty residential street.  As video evidence and the officers' own description of the five-minute encounter established, Napouk never verbally threatened the officers, rushed at them, or brandished or pointed the object in their direction.  Napouk's demeanor was calm, his gait and movements were slow and deliberate, and he was unresponsive to the officers' repeated commands that he put the object down.  When Napouk approached within ten feet of Sergeant Kenton, both officers fired seven rounds from their Glock semiautomatic pistols, striking and killing him. Napouk was a Las Vegas resident and a U.S. Navy veteran. Following his death, Napouk's parents brought claims under 42 U.S.C. § 1983 against the Las Vegas Metropolitan Police Department ("LVMPD"), Sergeant Kenton, and Officer Gunn, alleging excessive force and other constitutional and state law claims.

Because the reasonableness of a law enforcement officer's use of deadly force "'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011) (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). This case is no different.  A rational trier of fact *could* find that the officers' use of deadly force was objectively unreasonable because Napouk did not pose an imminent

threat to the safety of the officers, he was not committing a crime or resisting arrest, and because several non-lethal alternatives were available to contain the slowly unfolding encounter.  The majority errs by failing to evaluate the evidence in the light most favorable to the nonmoving party and by minimizing evidence that, when properly credited, create genuine disputes of material fact.  This is a matter that should be decided by a Las Vegas jury.

These errors also infected the second step of the majority's qualified immunity analysis.  In defining the "clearly established" right at issue in an excessive force case, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).  Set in its proper context, our caselaw clearly establishes that police officers may not kill a suspect who does not pose an imminent threat to the safety of officers or bystanders, is not committing any crime or actively resisting arrest, and in which non-lethal alternatives are available to the officers—even when the suspect is armed with a bladed weapon and ignores officer commands or advances upon them.  I respectfully dissent.

## I.

### A.

When resolving questions of qualified immunity at summary judgment, courts engage in a two-prong inquiry. First, a court "must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted).  Second, a court must determine whether the right at issue was "clearly

established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

In determining whether a police officer's use of force against a person is objectively unreasonable in violation of the Fourth Amendment, the trier of fact must give "careful attention to the facts and circumstances of each particular case," including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The *Graham* factors are non-exhaustive, *see Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994), and we have considered other relevant factors such as "whether officers gave a warning before employing the force," whether "there were less intrusive means of force that might have been used," and whether it should have been apparent to the officers that the person they used force against was emotionally disturbed. *Glenn v. Wash. Cnty.*, 673 F.3d 864, 875-76 (9th Cir. 2011).

As the Supreme Court explains, while courts have the discretion to decide the order in which to address the two qualified immunity prongs, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656. This is not unique to qualified immunity analysis; rather, "it is simply an application of the more general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (citation omitted). At summary judgment, we must "view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019) (citing

*Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007)). "Where a police officer has used deadly force, it is especially important that we adhere to that approach . . . [b]ecause the person most likely to rebut the officers' version of events—the one killed—cannot testify." *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (cleaned up).

Thus, where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, that is "a question of fact best resolved by a jury." *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003). Summary judgment is appropriate only when, after crediting the nonmovant's evidence and drawing all reasonable inferences in their favor, "a verdict in favor of the defendants on the claim for excessive force is the *only conclusion* that a reasonable jury could reach." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (emphasis added).

In *Tolan*, for example, the Supreme Court vacated the Fifth Circuit's grant of qualified immunity in an excessive force case because the court "failed to view the evidence at summary judgment in the light most favorable to [the plaintiff] with respect to the central facts of this case," failed to "credit evidence that contradicted some of its key factual conclusions," and "improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." 572 U.S. at 657 (citation omitted). That the Fifth Circuit granted qualified immunity under the second prong did not alter the Court's conclusion. "Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard." *Id.* "[W]e have instructed that courts should define the 'clearly established'

right at issue on the basis of the 'specific context of the case,'" and therefore "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* (internal citations omitted).

While the majority correctly recites the applicable summary judgment standard, *see* Maj. Op. at 9, at every turn the majority fails to apply it. Its errors permeate both prongs of its qualified immunity analysis, as I explain next.

**B.**

In determining whether Plaintiffs have sufficiently alleged a constitutional violation, the district court and the majority repeatedly erred by weighing the evidence in Defendants' favor and failing to credit competent evidence from Plaintiffs that create genuine issues of material fact. When viewing the evidence in the light most favorable to Plaintiffs, the evidence establishes that (1) Napouk did not pose an imminent threat to the safety of the officers or bystanders, (2) Napouk did not commit a severe crime and was not actively resisting arrest, and (3) the officers could have strategically repositioned and employed less lethal alternatives to contain a fraught situation with a mentally impaired individual. Based on the evidence presented in the record, a reasonable factfinder could conclude that Defendants' use of deadly force was objectively unreasonable under the circumstances.

**i.**

As a preliminary matter, I agree with my colleagues that Defendants had a reasonable, but mistaken, belief that Napouk was holding a bladed weapon. *See* Maj. Op. at 11-13. When "'an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would

have or *should* have accurately perceived that fact.'" *S.R. Nehad*, 929 F.3d at 1133 (quoting *Torres*, 648 F.3d at 1124). On this record, no reasonable officer should have accurately perceived at nighttime that Napouk's "sword" was in fact a homemade plastic toy.

The majority jumps to the conclusion, however, that "[w]ith the mistake of fact addressed, this becomes a straightforward case." Maj. Op. at 13. Not so. Even assuming Napouk's plastic object had been a bladed weapon and he was "behaving erratically," that does not establish that Napouk posed an imminent threat to the safety of the officers *as a matter of law*. An officer's reasonable use of deadly force still requires "that the suspect pose[] a significant threat of death or serious physical injury to the officer or others." *Gonzalez*, 747 F.3d at 793 (citation omitted). "[O]fficers may not kill suspects simply because they are behaving erratically, nor may they 'kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.'" *Peck v. Montoya*, 51 F.4th 877, 887-888 (9th Cir. 2022) (quoting *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997)). Rather, "courts must consider 'the totality of the facts and circumstances in the particular case'; otherwise, that a person was armed would always end the inquiry." *Glenn*, 673 F.3d at 872 (citation omitted).

Viewing the evidence in the light most favorable to Plaintiffs, Napouk displayed none of the characteristics that would suggest to a reasonable officer that he was an immediate threat to others. To begin with, the encounter occurred in the middle of an empty residential street shortly after midnight, with no bystanders present. Both officers described Napouk's general gait as "slow" and "deliberate." The record is undisputed that Napouk made no "furtive

movement[s]" or "harrowing gesture[s]" such as running, swinging, or lunging at Defendants. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Sergeant Kenton acknowledged that Napouk did not "wav[e]" the object at them and appeared "calm" as he smoked a cigarette through much of the encounter. Plaintiffs' expert also testified that Napouk gripped the object's handle without his index finger, which would not "have allowed for a quick attack."

Indeed, the district court acknowledged that Plaintiffs' evidence of Napouk's "slow pace, non-threatening grip on the object, calm demeanor, lack of verbal threats, and the officers' protection behind certain vehicles" would "contradict a finding of immediate threat" if taken as true. But rather than credit Plaintiffs' evidence that Napouk posed no immediate threat to anyone, the district court determined that Plaintiffs' evidence was "not indicative of the actual incident." The district court erred by "substituting [its] judgment concerning the weight of the evidence for the jury's." *Torres*, 648 F.3d at 1125 (cleaned up).

The district court also failed to credit video evidence that Napouk had not threatened the officers, construing the evidence instead to find that Napouk made "indirect verbal threats" against Defendants. The bodyworn video footage reflects that when Napouk approached the officers, Sergeant Kenton warned, "I'm gonna shoot you, motherfucker," to which Napouk responded, "You have to." Officer Gunn also warned Napouk, "If you take one more step, I will shoot you," and Napouk replied, "I know." After Sergeant Kenton warned again, "I'm going to shoot you. You come one more step, you're dead," Napouk proceeded forward and responded, "I know," before being shot by the officers.

Viewing the evidence in the light most favorable to Plaintiffs, Napouk's statements constituted expressions of self harm, not "indirect verbal threats." In *Glenn*, we reversed the district court, finding triable issues of material fact concerning the reasonableness of the officers' use of lethal force against a suicidal teenage suspect who held a knife to his own throat. 673 F.3d at 872. Although the suspect "did not respond to officers' orders to put the knife down" for several minutes, "a number of other circumstances weigh[ed] against deeming him an immediate threat to the safety of the officers or others," including that his threats of violence "focused on harming himself rather than other people" and that he had not attacked or threatened to attack the officers. *Id.* at 873 (internal citation and quotation marks omitted).

The majority makes the same summary judgment errors on appeal. My colleagues conclude, "Napouk was behaving erratically, holding what the officers reasonably perceived to be a lethal weapon, repeatedly ignoring their commands to stop and to drop it, and repeatedly deliberately advancing towards them with the weapon in his hand. Those facts and circumstances . . . show an immediate threat." *See* Maj. Op. at 17. While a jury could view the evidence in this light, our task on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The majority ignores conflicting testimony and video evidence establishing that Napouk never verbally threatened the officers, brandished or waved the object at them, lunged or charged at them, or made any sudden movements throughout the five-minute encounter. Although Defendants testified that Napouk's pace was "slow" and did not change

as he approached the officers, the majority asserts that this evidence does not "actually matter" because Napouk advanced to within nine feet of them at the time of the shooting, holding what they perceived was a sword. *See* Maj. Op. at 17. This is quintessential evidence-weighing. In *S.R. Nehad*, we refused to hold that an officer's use of lethal force was reasonable as a matter of law based on evidence that the decedent did not "make any sudden movements, or move the supposed knife in any way," and was moving at a "relatively slow pace" toward the officer. 929 F.3d at 1134. Here, a reasonable jury could weigh the significance of Napouk's slow pace and deliberate movements differently than the majority and conclude that Defendants had adequate time to respond to a slowly advancing Napouk with other non-lethal alternatives.[1] Taken together, Plaintiffs' evidence creates genuine issues of material fact as to whether Napouk posed an immediate threat to the safety of the officers.

**ii**.

As for the other two *Graham* factors, the "severity of the crime" and "actively resisting or evading arrest," the district court and majority improperly weigh the evidence in the moving party's favor to find Defendants' actions objectively reasonable. 490 U.S. at 396. The district court

---

[1] That Napouk was nine or ten feet away at the time of the shooting does not place the reasonableness of the officers' actions beyond debate. Officer Gunn testified that Napouk was 25 feet away when they first approached him, while Sergeant Kenton estimated a 15-foot gap. Bodycam video shows that the distance varied throughout the encounter as Napouk approached and Defendants retreated and repositioned behind Officer Gunn's patrol vehicle three times. The distance between Napouk and the officers, the pace of his approach, and whether the officers could have withdrawn to a safer distance before the fatal shooting are material factual questions that cannot be resolved on summary judgment.

acknowledged that "[i]nitially, Napouk's behavior, albeit suspicious, did not constitute a crime." However, according to the district court, this factor favored the officers, because there was "probable cause" to arrest Napouk for assault with a deadly weapon as he "was brandishing the object and refusing to respond appropriately to the officers' orders." The majority accepts the district court's determination.

This *Graham* factor plainly supports Plaintiffs. Defendants were called to the scene based on a report made on the "non-emergency" line about a suspicious person "talking to himself" and carrying a "slim jim" or tool or machete. There were no reports of a crime, much less a felony in progress. *See S.R. Nehad*, 929 F.3d at 1136 ("[A] particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor.").

The majority concludes that Defendants had "probable cause" to arrest Napouk because he was ignoring the officers' orders but overlooks Plaintiffs' evidence that Defendants had no intention of arresting him. Sergeant Kenton testified that Napouk "was not wanted for a crime," and Officer Gunn told Napouk, "We just want to talk, you're not in trouble." The majority also ignores Plaintiffs' conflicting evidence that Napouk was not brandishing the object or threatening the officers in any way. At a minimum, there is a genuine dispute whether Napouk's actions gave Defendants probable cause to arrest him based on his failure to follow orders, as well as whether Defendants intended to perform an arrest in the first place.

The majority's analysis with respect to the third *Graham* factor, actively resisting or fleeing arrest, suffers from the

same evidence-weighing errors. The district court concluded that "officers gave several warnings to Napouk that they would use deadly force if he continued to resist" and found these warnings objectively sufficient as a matter of law. The majority similarly concludes that there is no genuine dispute that Napouk heard the officers' commands. The majority fails to credit evidence in the record that Napouk may not have heard or understood the officers' orders or warnings. *See Glenn*, 673 F.3d at 876 (finding a disputed issue of material fact where the suspect "'may not have heard or understood [officers'] warnings' because he was intoxicated and there were other people yelling").

Napouk wore a tan baseball cap, sunglasses, backpack, and corded headphones in both ears, and he did not respond when Sergeant Kenton ordered him to remove his headphones or drop the object, making it unclear what orders Napouk was able to hear. A postmortem toxicology report indicated that Napouk was intoxicated on methamphetamine. Video evidence shows that throughout the encounter, Napouk was largely non-responsive or incoherent—at one point telling the officers that he gave birth to them. There was also significant noise from the overhead police helicopter and frequent miscommunication between the parties. LVMPD policy expressly acknowledges that a "subject may be non-compliant due to a . . . mental, physical or hearing impairment, . . . drug interaction or emotional crisis." Jury questions exist regarding whether similar impairments prevented Napouk from understanding the officers' warnings or complying with their instructions.

To be sure, there is also evidence that Napouk was able to hear Defendants, such as when he responded to their warnings that they would shoot him by saying, "you have to"

or "I know."  But the summary judgment standard does not permit us to pick and choose which evidence should be credited or discounted.  The record discloses a genuine dispute as to whether Napouk was able to hear or comprehend the officers' commands given the noise, his intoxicated state, and his mental state, and therefore whether he was actively resisting arrest.

### iii.

Perhaps the most glaring example of the majority's misapplication of the summary judgment standard is its analysis of the availability of non-lethal alternatives to contain this slowly unfolding situation.  "The availability of alternative methods . . . is a relevant factor in determining whether the amount of force used in a particular instance was, in fact, reasonable." *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (cleaned up); *see also Glenn*, 673 F.3d at 876.

Both officers carried taser guns.  Officer Gunn stated that using a taser could have been effective and that he believed Sergeant Kenton was transitioning to a taser while he provided firearm coverage because he "heard plastic shifting."  Indeed, at one point Sergeant Kenton drew and then holstered his taser, and Officer Gunn asked, "What do you have, Sarge?"—which was Officer Gunn's "attempt to ask him if he was transitioning" to a taser.  Sergeant Kenton did not respond, and Officer Gunn "didn't press the issue any further."[2]

LVMPD policy provides that even "where deadly force is clearly justifiable," using a taser is appropriate if "another

---

[2] The following statements came from LVMPD's Critical Incident Review Report.

officer is present and capable of providing deadly force to protect the officers and/or others as necessary." LVMPD's investigation of the incident concluded that there had been a breakdown in communication between Sergeant Kenton and Officer Gunn. Had the officers adequately communicated to allow Sergeant Kenton to transition to a taser, Officer Gunn could have maintained firearm coverage while Sergeant Kenton subdued Napouk with his taser.

Beyond the use of tasers, Plaintiffs presented evidence that Defendants had other non-lethal alternatives available to them. For example, Officer Gunn had a beanbag shotgun in his police vehicle and did not use it. A police helicopter provided continuous air support, which allowed the officers to reposition again without fear of losing Napouk. Both officers had pepper spray, and Sergeant Kenton had requested a unit with a beanbag shotgun and K-9 police dog. LVMPD Sergeant Dawid Chudoba had also arrived on the scene with a "low lethal shotgun" prior to Napouk being shot.

Finally, there was substantial evidence that Defendants could have strategically repositioned or withdrawn to a safer distance before the shooting. Plaintiffs' expert witness testified that, at the time of the shooting, Sergeant Kenton "could have moved behind his police vehicle, moved behind Gunn's police vehicle, or could have withdrawn further away from Napouk, instead of firing shots." LVMPD Undersheriff Christopher Darcy testified that at the time Sergeant Kenton fired at Napouk, he could have instead walked backward or used either his car or Officer Gunn's car as cover—but chose not to. Plaintiffs point out that strategic repositioning is LVMPD policy and Defendants had already repositioned behind Officer Gunn's car several times.

The district court made no mention of Plaintiffs' conflicting evidence, concluding instead that Defendants had already "repositioned several times to create more distance between themselves and Napouk" and that "[i]t was only when they had no more options to reposition or retreat that the situation got dangerous enough to use deadly force." The majority takes the same view, stating that "[o]nly when Napouk advanced upon them a fifth time with what they reasonably believed was a long, bladed weapon, putting himself on a path where he could end up between Kenton and Gunn such that they were concerned about crossfire, failed to follow commands to drop it and stop, and came within nine feet of Kenton did the officers use deadly force. That the officers did not retreat another time to wait for the less lethal means they requested does not make their actions unreasonable." Maj. Op. at 23.

It is clear that the majority has improperly adopted the movants' view of the evidence, crediting Defendants' testimony that Napouk's failure to follow commands, his repeated advancements, and the potential for crossfire did not permit them to take any action other than to use deadly force. In discounting Plaintiffs' contrary evidence in its analysis, the majority repeatedly "neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan*, 572 U.S. at 660.[3]

---

[3] The majority also rejects Plaintiffs' evidence because, in its view, the factual circumstances here are "substantially different" from other cases such as *Glenn*, 673 F.3d 864 and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001). *See* Maj. Op. at 18. This turns the summary judgment standard on its head. In determining whether Plaintiffs have sufficiently

When viewing the evidence in the light most favorable to the nonmoving party, the evidence would permit a jury to conclude that Defendants were not facing an imminent threat of serious harm by a stationary or slowly advancing Napouk who never threatened them, or lunged or charged or waved the plastic object at them.  A jury could reasonably find that Defendants had time to strategically reposition or withdraw to a safer distance, as there were no bystanders in the vicinity, there was continuous air support, and other backup had arrived or was nearby.  A jury could also find that Defendants could have deployed less lethal alternatives such as a taser or pepper spray and that it was the officers' miscommunications and lack of coordination that caused them to act with undue haste, with lethal consequences.[4]  In

---

alleged a constitutional violation, Plaintiffs are not required to allege facts that are similar enough to other cases where we found genuine disputes of material fact.  On summary judgment, we must determine whether a rational trier of fact might resolve the issue in favor of the *nonmoving* party, by crediting the nonmovant's evidence and drawing all reasonable inferences in that party's favor.  *S.R. Nehad*, 929 F.3d at 1132.

[4] Napouk's obvious mental instability is also a relevant factor in the jury's consideration of the reasonableness of the officers' actions.  *See Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed."); *see also Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019) ("Although we have refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, our precedent establishes that if officers believe a suspect is mentally ill, they should make a greater effort to take control of the situation through less intrusive means.") (cleaned up).  Whether Defendants should have exercised greater caution and restraint in view of Napouk's mental state is a genuine dispute of material fact.

short, the evidence permitted a reasonable jury to find that Defendants' use of deadly force was objectively unreasonable under the circumstances.

## C.

The majority also errs under the second prong of the qualified immunity analysis by defining the "clearly established" right at issue in a context "that imports genuinely disputed factual propositions." *Id.* at 657. When the clearly established right is framed in the specific context of this case and, importantly, in the light most favorable to the nonmoving party, our circuit precedent clearly establishes that Defendants' deadly force was objectively unreasonable under the circumstances.

A police officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). As the Supreme Court recently reiterated, "this Court's case law does not require a case directly on point for a right to be clearly established," but existing precedent must "place[] the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Two cases in particular define the clearly established right in question: *Glenn v. Washington*, 673 F.3d 864 and *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013). These cases clearly establish that law enforcement may not use deadly force against a person with a bladed weapon who does not pose an imminent threat to the safety of officers or bystanders, is not committing any crime or actively resisting arrest, and in which non-lethal alternatives

are available to manage a situation involving a suicidal or mentally unstable individual. Contrary to the majority's position, these cases establish that lethal force is objectively unreasonable even when the suspect ignores officer orders or warnings or is advancing on law enforcement while armed.

In *Glenn v. Washington*, a mother called 911 around 3:00 a.m. when her intoxicated adult son, Lukus Glenn, held a "pocketknife to his neck and threatened to kill himself." 673 F.3d at 866-67. She told the 911 dispatcher that her son was "out of control, busting our windows, and has a knife and is threatening us," later adding that he stated he was "not leaving until the cops shoot him and kill him." *Id.* at 867. The arriving police officer positioned himself eight to twelve feet from Lukus, who stood outside near the garage, and shouted commands at Lukus to "drop the knife or I'm going to kill you." *Id.* at 868. A second officer arrived and took position six to twelve feet from Lukus, yelling "drop the knife or you're going to die" and "drop the fucking knife." *Id.* Neither officer had a taser gun, but a third arriving officer shot Lukus with a beanbag shotgun. *Id.* at 869. Lukus seemed to "retreat" after being struck by the beanbag but moved toward the house where his parents were located, and the other officers opened fire with their Glock pistols, killing Lukus. *Id.* We held that the district court "erred in granting summary judgment on the constitutionality of the officers' use of force." *Id.* at 878.

*Glenn* is similar to this appeal in all material respects. *Glenn* involved the unreasonable use of deadly force on a mentally unstable suspect who had a bladed weapon and presented an apparent threat to himself. *See id.* at 879. Although Glenn "did not respond to officers' orders to put the knife down" for several minutes, other circumstances

"weigh[ed] against deeming him 'an immediate threat to the safety of the officers or others,'" including that his threats "focused on harming himself rather than other people" and that he had not attacked or threatened to attack the officers themselves.  *Id.* at 873 (internal citation omitted).

We also concluded that the officers "could easily have positioned" the parents behind them or "the officers could have positioned themselves between [Glenn] and the front door."  *Id*. at 879.  Because of conflicting evidence in the record, we assumed at summary judgment that a taser was a feasible alternative.  *Id.* at 878.  We observed that the Lukus family had not called the police to report a crime, and viewing the evidence in plaintiff's favor, concluded that Lukus's conduct was not "active resistance" because he had only ignored officer commands.  *Id.* at 874-75.  Finally, we concluded that Lukus "was 'obviously emotionally disturbed,' a factor to which the officers should have assigned greater weight.'"  *Id.* at 875.

*Glenn* provides clear notice that law enforcement's use of deadly force can be objectively unreasonable when a mentally unstable suspect armed with a knife does not pose an imminent threat to the safety of officers or bystanders, has not committed any crime, is not actively resisting arrest simply by ignoring officer commands, and whose mental instability warrants greater caution and restraint, particularly where non-lethal alternatives exist such as repositioning, beanbag shotguns, and tasers.[5]

---

[5] The majority attempts to distinguish *Glenn* on the basis that Lukus was stationary and never advanced on the officers, *see* Maj. Op. at 18, but Supreme Court precedent makes clear that a case does not need to be

In *Hayes v. County of San Diego*, officers arrived at Hayes's residence shortly after 9:00 p.m. in response to a neighbor's domestic disturbance call.  736 F.3d at 1227. Upon the first officer's arrival, Hayes's girlfriend told the sheriff's deputy that Hayes had attempted suicide that night by inhaling exhaust fumes from his car.  Two deputies entered the home and encountered Hayes in an adjacent room eight feet away and ordered Hayes to "show [them] his hands" because his right hand was behind his back.  *Id.* Hayes "[took] one or two steps toward[]" a deputy while "rais[ing] both his hands to approximately shoulder level, revealing a large knife pointed tip down in his right hand." *Id.* at 1227-28.  The deputy believed that "Hayes represented a threat to his safety" and both deputies drew their weapons and shot a total of four rounds at Hayes from a distance of "six to eight feet away," killing him.  *Id.* at 1228.  Hayes's girlfriend testified that "Hayes was not 'charging' at the deputies and had a 'clueless' expression on his face at the time, which she described as 'like nothing's working upstairs.'" *Id.*

The district court granted summary judgment based on the undisputed fact that Hayes was moving toward the deputies with a knife raised, causing the deputies to believe that Hayes was an immediate threat.  *Id.* at 1233.  We reversed, holding that there were genuine disputes of

---

"directly on point for a right to be clearly established." *Rivas-Villegas,* 595 U.S. at 5; *Hope*, 536 U.S. at 741 ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."); *see also Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc).  Even if *Glenn* did not involve a suspect armed with a knife advancing on officers, other cases like *Hayes* and *S.R. Nehad* make clear that this does not render the officers' actions reasonable as a matter of law.

material fact concerning the objective reasonableness of the officers' use of deadly force.  *Id.* at 1234 n. 6.  We observed that Hayes had committed no crime and there was no evidence he was "actively resisting arrest."  *Id.* at 1233. Although Hayes was "walking towards the deputies," we noted that "he was not charging them."  *Id.*  In addition, Hayes "did not swing the knife at [a deputy]" and "[t]here [was] no clear evidence . . . that Hayes was threatening the officers with the knife here."  *Id.* at 1234, 1234 n.6.  We reiterated that the "mere fact that a suspect possesses a weapon does not justify deadly force."  *Id.* at 1233 (citation omitted).

*Hayes* differs from this appeal in one respect: the deputies did not warn Hayes before shooting him because they "didn't believe [they] had any time."  *Id.* at 1228.  But this factor cuts in Plaintiffs' favor because the shooting in *Hayes* occurred within four seconds of the deputies ordering him to show his hands, *see id.*, and at a distance of only six to eight feet in "a dimly lit, confined space," *id.* at 1234 n.6. Here, Defendants shot Napouk when he was nine feet away from Sergeant Kenton on a well-lit, open street after Defendants interacted with him for over five minutes.  Our observation in *Hayes* applies with equal force here:

> The circumstances of this case can be viewed in multiple ways: as "suicide by cop," as officers suddenly threatened with a deadly weapon, or as a depressed man simply holding a knife when confronted by law enforcement.  As with most excessive force claims, the correct determination of the circumstances here will require a careful

> balancing of the evidence and the inferences
> that can be made therefrom.

*Id.* at 1236.

*Glenn* and *Hayes* "'squarely govern[]' the specific facts at issue," *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted), and would make "clear to a reasonable officer that [fatally shooting Napouk] was unlawful in the situation he confronted," *Saucier v. Katz*, 533 U.S. 194, 202 (2001).[6] Napouk's Fourth Amendment right to be free from deadly force under these circumstances was clearly established in 2011 under *Glenn* and 2013 under *Hayes*. Accordingly, I would conclude that Defendants are not entitled to qualified immunity as a matter of law.

## II.

Plaintiffs asserted several other federal and state law claims that were adjudicated by the district court in Defendants' favor: (1) municipal liability claims under *Monell v. Department of Social Services*, 436 U.S. 658

---

[6] A third case, *S.R. Nehad*, also bears similarity to this appeal in several material ways. A police officer received reports of a man threatening people with a knife and encountered Nehad in an alleyway shortly after midnight. 929 F.3d 1130-31. Nehad matched the suspect's description and approached the officer at a "steady pace" or "a relatively slow pace" as the officer exited his vehicle. *Id.* at 1131, 1134. The officer ordered Nehad to "Stop, drop it," before shooting Nehad at a range of seventeen feet. *Id.* at 1131. While *S.R. Nehad* supports Plaintiffs' argument that even a suspect armed with a knife and advancing on a police officer "does not end the reasonableness inquiry," *id.* at 1134, the opinion was published in 2019 and cannot serve as "clearly established law" at the time of Napouk's death in 2018. *See Kisela*, 584 U.S. at 104 ("[R]easonableness is judged against the backdrop of the law at the time of the conduct.") (citation omitted).

(1978); (2) deprivation of familial relations without substantive due process in violation of the Fourteenth Amendment, and (3) state law claims for battery-wrongful death and negligence.

Once the district court found that Napouk had suffered no constitutional violation, the court declined to evaluate Plaintiffs' claims of municipal liability based on an unconstitutional custom, practice, or policy. Because a rational juror could find that the officers used excessive force in shooting and killing Napouk in violation of his Fourth Amendment rights, I would remand Plaintiffs' *Monell* claims to the district court for an analysis of LVMPD's policies and practices in the first instance.

As for Plaintiffs' Fourteenth Amendment claim, our precedent recognizes that parents have a liberty interest in the companionship and society of their child. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991); *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018) ("A decedent's parents and children generally have the right to assert substantive due process claims under the Fourteenth Amendment."). A deprivation of that interest is a constitutional violation that a plaintiff may vindicate through a § 1983 action, even when the child is an adult. *See Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008). As parents of their deceased adult son, Plaintiffs have standing under the law of this circuit.

Even so, I agree with the majority that Plaintiffs have failed to demonstrate a substantive due process claim. Only "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d

1123, 1132-33 (9th Cir. 2017) (quoting *Wilkinson*, 610 F.3d at 554) (alteration in original). "[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230 (citing *Wilkinson*, 610 F.3d at 554). Under this standard, Defendants did not act with a purpose to harm Napouk unrelated to legitimate law enforcement objectives, which include "self-defense." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Plaintiffs' allegations therefore fail under the purpose-to-harm standard.

Finally, Plaintiffs' battery-wrongful death claim should survive with their Fourth Amendment claim. In Nevada, a state law claim for battery by a police officer mirrors the federal civil rights law standard. *Williams v. City of Sparks*, 112 F.4th 635, 646-647 (9th Cir. 2024) ("Liability attaches at the point at which the level of force used by a peace officer exceeds that which is objectively reasonable under the circumstances."). Because a Las Vegas jury could find that Defendants' use of deadly force was objectively unreasonable, I would reverse summary judgment on Plaintiffs' state law claim for battery-wrongful death.

Plaintiffs also allege a negligence-wrongful death claim under Nevada law, while Defendants assert discretionary-function immunity. Nevada has waived its general state immunity under Nevada Revised Statutes § 41.031. The State retains a "discretionary function" form of immunity for officials exercising policy-related or discretionary acts. *See* Nev. Rev. Stat. § 41.032(2) (Immunity exists "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its [employees] . . . , whether or not the

discretion involved is abused."). Defendants, as the State employees, have "the burden of proving that the discretionary function exception applies." *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000).

Nevada's discretionary-function immunity statute "mirrors the Federal Tort Claims Act" and is subject to the same two-part federal test as articulated in *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). *Martinez v. Maruszczak*, 168 P.3d 720, 727 (Nev. 2007). State actors are entitled to discretionary-function immunity under Nevada Revised Statutes § 41.032(2) if their decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Id.* at 729. "[I]n a close case [the court] must favor a waiver of immunity and accommodate the legislative scheme." *Hagblom v. State Dir. of Motor Vehicles*, 571 P.2d 1172, 1175 (Nev. 1977) (citation omitted).

The officers' actions do not fall under the discretionary-immunity exception, and the majority errs in holding otherwise. Even if a split-second decision to use lethal force were based on "social" or "political" policy so as to be a discretionary function, *Martinez*, 168 P.3d at 729, decisions made in "bad faith" or with "'willful or deliberate disregard' for a citizen's rights[] [are not] protected under the immunity statute," *Jones*, 873 F.3d at 1133 (evaluating immunity under Nev. Rev. Stat. § 41.032(2)). A rational juror could find that the officers acted unreasonably and in "willful disregard" for Napouk's rights by using lethal force under circumstances that did not require the use of lethal force. I would therefore conclude that Defendants lack discretionary-function immunity and reverse summary judgment on Plaintiffs' Nevada negligence-wrongful death claim.

## III.

On this record, "we cannot say that a verdict in favor of the defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach." *Gonzalez*, 747 F.3d at 797. This case belongs before a jury of Las Vegas citizens to make that ultimate determination.